## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

MANNIE GARCIA,

      Plaintiff,

      v.

MONTGOMERY COUNTY, MARYLAND,
OFFICER CHRISTOPHER MALOUF, *in his official and individual capacities,*
OFFICER KEVIN BAXTER, *in his official and individual capacities,*
      and
CHIEF OF POLICE THOMAS MANGER, *in his official capacity,*

      Defendants.

Civil Action No. TDC-12-3592

## MEMORANDUM OPINION

Plaintiff Mannie Garcia, an award-winning photojournalist, alleges that, in June 2011, he was arrested by Montgomery County Police Department officers for disorderly conduct solely because he was video recording them as they effected the arrest of two other people. He was later found not guilty of that offense. Garcia asserts that by arresting him for filming, the officers violated his rights under the First and Fourth Amendments to the Constitution. Garcia also contends that the video card in his camera, which contains the record of the events of that night, was unlawfully seized by one of the officers and never returned. In response to these events, Garcia filed suit against the officers involved in his arrest, the Montgomery County Police Department ("MCPD"), and various other MCPD officials, asserting claims under 42 U.S.C. § 1983 for the alleged First and Fourth Amendment violations relating to his arrest; a First Amendment retaliation claim, based on his belief that various police officers were trying to

intimidate him out of pursuing legal action; several other statutory and common law actions; and

a 42 U.S.C. § 1983 claim against the MCPD for unconstitutional policies, customs, and practices.

Defendants paint a very different picture of the events leading to Garcia's arrest, asserting

that Garcia was arrested not because he was video recording the police, but because, after a

police officer approached him to ask benign questions about what he was doing, Garcia began to

yell and curse, and continued to do so despite being asked repeatedly to quiet down. Defendants

also deny taking Garcia's video card. From their perspective, Garcia's arrest does not raise First

Amendment issues about the right to film police officers, but is instead an attempt to recast a

routine arrest for disorderly conduct as a case of constitutional significance.

Presently pending before the Court are Defendants' Motion for Summary Judgment, ECF

No. 62, and Garcia's Cross-Motion for Partial Summary Judgment, ECF No. 63. The Court

heard oral argument on the motions on September 9, 2015. For the reasons outlined below,

Defendants' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART,

and Garcia's Cross-Motion for Summary Judgment is GRANTED IN PART and DENIED IN

PART.

## BACKGROUND

### I.    Video Recording of Police Activity

At about 7:30 p.m. on the evening of June 16, 2011, Garcia and his wife, Vicky Allen,

met a friend for dinner at Woomi, a restaurant in Wheaton, Maryland near Georgia Avenue and

Hickerson Drive. Nearby, at about 8:30 p.m., Carlos Grajeda and Lee Williams, members of

Montgomery County's Civilian Alcohol Enforcement squad, witnessed a man buying alcohol for

a minor. Grajeda and Williams put out a call for police officers to assist them in citing the two

individuals involved in the alcohol purchase. Officer Kevin Baxter and Officer Michael Graves, each in his own patrol car, responded to the call.

Soon after Officers Baxter and Graves arrived, between 8:40 and 9:00 p.m., Garcia and Allen left Woomi and headed back to their car, which was parked across the street from the restaurant. As Garcia crossed the street, he noticed the police officers and the alcohol suspects, who were about 100 feet, or a block and a half, away. Garcia saw one of the officers get "a little rough" with one of the men—the officer "sort of … push[ed] him"—so Garcia took out his camera and began video recording. Cross Mot. Sum. J. Ex. 2 (Garcia Deposition) at 30, ECF No. 63-4; Mot. Sum. J. Ex. 4 (Garcia Deposition) at 27, ECF No. 62-7.[1] Garcia was video recording the scene with his Nikon Coolpix 7000, a camera capable of shooting both still photographs and video.

Garcia caught Grajeda's attention. Grajeda could see that Garcia had something in his hands, but could not identify what it was, and, in Grajeda's estimation, Garcia was "acting erratically." Mot. Sum. J. Ex. 2 (Grajeda Deposition) at 5, ECF No. 62-5. Garcia's supposed strange behavior "really concerned" Grajeda, in part because they were in a high-crime area. *Id.* Garcia, for his part, maintains that he was behaving normally. Grajeda pointed Garcia out to Officer Baxter, who had not noticed him because he was in the middle of writing a citation for one of the suspects. When Officer Baxter caught sight of him, Garcia was in a "very dark" section of the street, near an alleyway. Mot. Sum. J. Ex. 1 (Baxter Deposition) at 16, ECF No. 62-4. Garcia appeared to Officer Baxter to be trying to hide, behavior that Officer Baxter thought was "suspicious." *Id.* at 16-17.

---

[1] Citations to exhibit page numbers are to the page numbers assigned by the Court's CM/ECF filing system.

By this point, it was getting dark. Officer Baxter, wanting to get a better view of Garcia, flashed his police cruiser's spotlight in Garcia's direction. Once Garcia was illuminated, Officer Baxter could see that he was holding what appeared to be a camera. Officer Baxter kept the spotlight on Garcia for about 10 seconds, while he evaluated whether Garcia posed a threat to the officers or nearby civilians. Officer Baxter determined that Garcia was not doing anything threatening, so he turned off the spotlight and returned to writing the citation. After being spotlighted, Garcia went back across the street, in front of Woomi. According to Grajeda, as Garcia ran across the street he was "belligerent" and was yelling. Mot. Sum. J. Ex. 2 at 10. Outside Woomi, Garcia put his camera down on a newspaper box—hoping for a more stable image—and continued to film.

At that time, Malik and Efigenia Rashid were sitting in a nearby parked car with the windows rolled up. Malik Rashid rolled down his window and politely asked Garcia what he was doing, to which Garcia responded, "keeping [them] honest." Mot. Sum. J. Ex. 4 at 32-33. By that point, the arrest seemed like a "routine" detention: the two alcohol suspects were seated on the curb, and the officers were no longer in physical contact with them. *Id.* at 40-43.

Garcia stayed near the newspaper box, outside Woomi, for two to three minutes before he walked up the street towards the officers, stopping when he was directly across from them. Garcia continued to record what was happening, narrating the events into his camera. Officer Graves, however, asserts that Garcia was yelling at both the officers and the Civilian Alcohol Enforcement team, an assertion Garcia denies.

According to Officer Baxter, when Garcia set up across the street from them, he was standing in another dark area, prompting Officer Baxter to again shine his spotlight on Garcia to see what he was doing. Garcia then moved to a third location up the block, about 35 feet away

4

from the officers.  As this was happening, Officer Graves began to feel that "something was [not] right."  Mot. Sum. J. Ex. 8 (Graves Deposition) at 14. ECF No. 62-11.  Garcia was drawing "all of our attention," leaving the officers "distracted" from the task of processing the alcohol suspects. *Id.* at 9.  Officer Graves accordingly called for backup.

## II.    The Arrest of Garcia

In response, Officer Christopher Malouf arrived on the scene.  He spoke briefly with Officer Baxter, who informed him that there was "a subject across the street standing in the shadows" who "was possibly filming."  Mot. Sum. J. Ex. 14  (Malouf Deposition) at 5, ECF No. 62-17.  Officer Baxter remarked that he could not see Garcia clearly, so was not sure if he "posed a threat or not," and that Garcia was "deterring" him from processing the alcohol suspects.  *Id.* Officer Malouf walked in Garcia's direction, but because of the darkness, he could not actually see Garcia until he was about three to four feet away from him.  Once he was near Garcia, Officer Malouf tried to ascertain what was going on, asking him, "Can I help you with anything?" and "Is there any way I can assist you?" *Id.* at 15.

Garcia asserts that when Officer Malouf approached him and asked him what he was doing, he promptly let go of his camera—which he had on a strap around his neck—opened up his hands to show Officer Malouf that he was not holding anything, and stated, in a normal tone of voice, "My name is Mannie Garcia and I'm with the press."  Mot. Sum. J. Ex. 4 at 48, 50.  Although Garcia let go of his camera, it was still recording.  In response, Officer Malouf promptly declared, "That's it, you're under arrest." *Id.* at 50-51.

Officer Malouf, however, tells a very different story.  He asserts that Garcia never identified himself as a member of the press.  Instead, Garcia said "I have a right to be here" and "you can't tell me to move."  Cross-Mot. Sum. J. Ex 14 (Trial Transcript) at 55, ECF No. 63-16.

Garcia then "became disorderly," yelling curse words and refusing to answer questions.  Mot. Sum. J. Ex. 14 at 12.  At that point, Officer Malouf moved closer to Garcia and warned him that if he did not calm down, he would arrest him for disorderly conduct.  Rather than calming down, Garcia continued to yell and curse, at one point gesturing towards Officer Baxter while yelling, "This fucking guy." *Id.* at 17-18.  After trying to calm Garcia down for several minutes without success, Officer Malouf decided to arrest him for disorderly conduct, noting that everyone in the vicinity was now focused on Garcia.

At some point—whether before Officer Malouf decided to arrest Garcia or after is unclear—others also heard Garcia begin to yell.  Efigenia Rashid heard Garcia yell so loudly that, although her car windows were rolled up, it distracted her from the game she was playing on her tablet.  Officer Baxter heard Garcia yell, "And this fucking guy" while gesturing in his direction, Mot. Sum. J. Ex. 1 at 19, while Grajeda heard Garcia yell, "[a]nd tell those fuckers to leave me alone, or I'm going to . . .," *id.* Ex. 2 at 12.  Officer Graves also heard Garcia yelling. Grajeda remembers Garcia "screaming and yelling" that he was with the press, *id.* Ex. 2 at 13, while Williams heard Garcia yelling something about his First Amendment rights and identifying himself as a member of the press.

According to Garcia, when Officer Malouf arrested him, he promptly put Garcia into a choke hold and began to drag him across the street, towards his police cruiser, an assertion Officer Malouf disputes.  While they were in the middle of the street, Officer Baxter came up, pulled Garcia's arms behind his back, and handcuffed him.  As a result of the choke hold and being pulled by both officers, Garcia tripped over the curb, falling on his left knee and tearing his pants.  As he was being held by the neck and dragged across the street, Garcia called out for his

wife and also yelled that Internal Affairs was "going to have a field day." Mot. Sum. J. Ex. 4 at 59, 65.

Garcia further alleges that once they reached the cruiser, Officer Malouf shoved him against the side of the car, causing him to hit the cruiser with a "hard impact." Cross-Mot Sum. J. Ex. 2 at 58-59. Officer Malouf then patted Garcia down. As part of that process, Officer Malouf instructed Garcia to spread his legs. When Garcia did so, Officer Malouf kicked out Garcia's right foot, causing him to lose his balance and hit his head against the side of the cruiser before falling to the ground. While this was happening, Officer Malouf was mocking him, asking him why he was falling down, and then laughing at him with the other officers.

The officers dispute Garcia's allegations relating to the use of force. Specifically, Officer Malouf denies that he placed Garcia in a choke hold. Officer Baxter acknowledges that Garcia fell as the officers took him across the street, but asserts that Garcia deliberately went limp, in an effort to "fall to the ground unprompted." Mot. Sum. J. Ex. 1 at 21. Officer Baxter further contends that once back at the cruiser, Garcia was "thrashing his body back and forth" against the cruiser, in an attempt to injure himself, prompting Officer Malouf to subdue Garcia by applying force to a pressure point on Garcia's neck. *Id.* at 22.

Meanwhile, Allen, Garcia's wife, began to approach the scene. Officer Baxter warned her to stay back or she would be arrested. Garcia claims that, in response to Allen's approach, Officer Baxter said, "If that fucking bitch takes one more step, I'm going to arrest her ass." Mot. Sum. J. Ex. 4 at 68. In response, Garcia yelled to Allen to stay back, prompting Officer Malouf to again apply force to a pressure point, pressing his thumb into Garcia's neck for about 10-15 seconds, causing Garcia to contort in pain and forcing his head into the side of the cruiser.

At some point during the arrest process, Garcia's camera was removed from around Garcia's neck, and Officer Baxter took control of it. Pursuant to department policy, Officer Baxter turned the camera off. He then placed it either in or on top of the cruiser.

Eventually, Officer Malouf placed Garcia in the cruiser and transported him to the police station. According to Garcia, while in the station parking lot, before taking Garcia inside, Officer Malouf was "fiddling" with Garcia's camera, pressing various buttons and opening various compartments, until he eventually found the video card. Mot. Sum. J. Ex. 4 at 70-71. Garcia contends that Officer Malouf removed the video card and placed it in his shirt pocket. Officer Malouf denies doing so. Officer Malouf took Garcia into the police station, then to the Central Processing Unit, where his belongings were inventoried, he was fingerprinted, and his mug shot was taken.

At about 3:30 a.m., Garcia was released from custody and picked up by his wife at the Central Processing Unit. While all of Garcia's other property was returned to him, the video card from his camera was not. Although Garcia contends that he was injured, he did not immediately seek medical attention. Instead, he went home because, at that point, all he wanted to do was shower and go to bed. In the days after his arrest, Garcia had bruising on his left knee as a result of the incident, but did not have bruises on his neck.

### III.   Post-Arrest Events

On December 16, 2011, Garcia proceeded to a bench trial in the District Court for Montgomery County, Maryland on the charge of disorderly conduct. He was found not guilty.

Prior to that trial, Garcia filed a complaint with the MCPD Internal Affairs Division against Officers Baxter and Malouf about the events of June 16, 2011. After an investigation into Garcia's allegations, the MCPD took no disciplinary action against either officer. Garcia

contends that after he filed his Internal Affairs complaint, various MCPD officers began periodically to park near his house to observe and intimidate him. Specifically, Garcia alleges that during the week of December 6, 2011, the week preceding his trial on the disorderly conduct charge, he twice saw Officer Malouf parked in front of a house across the street from Garcia's home. That house had the same house number that Officer Malouf mistakenly entered as Garcia's address on the June 16, 2011 incident report. Both times, Garcia saw Officer Malouf remain there for 2-3 minutes, parked in such a way that his cruiser would not be visible to those inside of the house.

On March 19, 2013, Garcia saw another such police cruiser, this one parked across and one house over from Garcia's home. Garcia began to video record the occupant, Officer Douglas Barros, because he believed the officer was there to observe him. Officer Barros contends that he was there doing paperwork, having just dealt with a disorderly conduct incident on a bus nearby. Officer Barros eventually noticed that Garcia was video recording him, which he thought was suspicious, since he had never before had someone film him doing paperwork. Officer Barros went over to Garcia to "check up" on him and asked Garcia if he needed any help. Cross Mot. Sum. J. Ex. 19 (Barros Deposition) at 10, ECF No. 63-21. In response, Garcia told Officer Barros that he did not need any help and accused him of harassment. Officer Barros gave Garcia the name and phone number of his supervisor, then departed. Garcia never contacted the supervisor because he "did not want to have any more contact with the Police." Cross Mot. Sum. J. Ex. 2 at 14.

Defendants deny that there was a police department campaign to observe and intimidate Garcia. According to Officers Baxter and Malouf, Garcia's street is a shortcut to University Boulevard, a major road, and Garcia's house is near a nursing home to which MCPD officers are

frequently called.  If there was any regular police presence on Garcia's street, they contend, it was not because officers were there to intimidate Garcia, but because officers were using the shortcut or responding to nursing home calls.

Garcia was, however, a topic of conversation among officers.  In the days prior to and during Garcia's disorderly conduct trial, Officers Baxter and Graves exchanged a series of text messages about those proceedings.  Prior to the trial they discussed whether Garcia would take a guilty plea, with Officer Graves remarking that he "hope[d]" Garcia would "take community service," to which Officer Baxter replied that he though they "ha[d] a solid case."  Cross Mot. Sum. J. Ex. 22 at 2, ECF No. 63-24.  During the trial, Officer Graves texted Officer Baxter that Officer Malouf, after seeing a "liquor guy" testify, declared that the case was "all bullshit." *Id.* At some point, Officers Baxter and Graves joked about going drinking with Garcia, with Officer Baxter suggesting they "[d]o a couple saki bombs then go be disorderly," and Officer Graves adding that they could then "make up a story to make millions and never work again." *Id.* at 3. After Garcia filed his civil suit, Officers Baxter and Graves again exchanged messages, with Officer Graves informing Officer Baxter that the suit had been filed and, in response to Officer Baxter's request, that he had emailed him a link to a news story about the case. *Id.* at 4.

## IV.    Procedural History

On December 7, 2012, Garcia filed suit in this Court against Officers Baxter, Graves, and Malouf, Montgomery County, Police Chief Thomas Manger, and Lieutenant Mark Sheelor, alleging eight causes of action:  (I) a 42 U.S.C. § 1983 ("§ 1983") claim for violation of his First and Fourteenth Amendment rights based on his allegation that he was arrested for video recording police activity; (II) a § 1983 claim for First Amendment retaliation; (III) a § 1983 claim for violation of his Fourth and Fourteenth Amendment rights based on the allegation that

he was arrested and had his property seized without probable cause; (IV) a § 1983 claim pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), against Montgomery County only; (V) a claim under the Privacy Protection Act, 42 U.S.C. § 2000aa *et seq.*; (VI) a common law false arrest and false imprisonment claim; (VII) a common law malicious prosecution claim; and (VIII) a common law battery claim against Officer Malouf only. All individual defendants were sued in both their individual and official capacities, with the exception of Chief Manger and Officer Graves, who were sued in their official capacities only.

On August 23, 2013, after Defendants moved to dismiss the Complaint, the Court (Motz, J.) issued a Memorandum Opinion dismissing various defendants and claims, and bifurcating some claims. ECF No. 15. Specifically, the Court dismissed (1) all claims against Officer Graves and Lt. Sheelor; (2) all claims against Officer Baxter, except the First Amendment and retaliation claims; (3) the false arrest/false imprisonment and malicious prosecution claims against Montgomery County and Chief Manger; (4) the Privacy Protection Act claim against all defendants except Montgomery County; and (5) all claims against officers in their official capacity, except for Chief Manger. The Court bifurcated for purposes of discovery (1) all remaining claims against Montgomery County, with the exception of the Privacy Protection Act claim, and (2) all claims against Chief Manger.

On January 20, 2015, Defendants filed a Motion for Summary Judgment. ECF No. 62. On February 19, 2015, Plaintiffs filed a Cross-Motion for Summary Judgment, to which Defendants responded on March 24, 2015. ECF Nos. 63 & 64. Plaintiffs filed a Reply Memorandum on April 23, 2015. ECF No. 65. The Court heard oral argument on September 9, 2015.

## DISCUSSION

For purposes of the pending summary judgment motions, the claims and defendants at issue are: (1) the First Amendment claims in Count I against Officer Baxter and Officer Malouf; (2) the First Amendment retaliation claim in Count II against Officer Baxter and Officer Malouf; (3) the Fourth Amendment claim in Count III against Officer Malouf; (4) the Privacy Protection Act claim in Count V against Montgomery County; (5) the false arrest and false imprisonment claim in Count VI against Officer Malouf; (6) the malicious prosecution claim in Count VII against Officer Malouf; and (7) the battery claim in Count VIII against Officer Malouf. Defendants seek summary judgment on all of these claims. Garcia, in his cross motion, seeks summary judgment on Counts I (First Amendment), III (Fourth Amendment), VI (false arrest/false imprisonment), and VII (malicious prosecution).

## I.     Legal Standards

### A.     Summary Judgment

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court must believe the evidence of the non-moving party, view the facts in the light most favorable to the nonmoving party, and draw all justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The nonmoving party has the burden to show a genuine dispute on a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). "A material fact is one that might affect the outcome of the suit under the governing law." *Spriggs v.*

12

*Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson*, 477 U.S. at 248) (internal quotation marks omitted).   A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248–49.

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'"   *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris, Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997)).

### B.   Qualified Immunity

Officers Baxter and Malouf move for summary judgment on the basis that they are entitled to qualified immunity.   Government officials sued in their individual capacities, as these officers are here, may invoke the protection of qualified immunity to bar a claim for civil damages under 42 U.S.C. § 1983.   *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).   Qualified immunity shields government officials from liability for conduct that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.*   The doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).   Because of the latter interest, qualified immunity protects police officers and public officials from claims of constitutional violations that arise from "reasonable mistakes as to the legality of their actions." *Saucier v. Katz*, 533 U.S. 194, 206 (2001).   It leaves unprotected only "the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The qualified immunity analysis can be separated into two inquiries: (1) whether the facts alleged, "[t]aken in the light most favorable to the party asserting the injury, ... show the officer's conduct violated a constitutional right," and (2) whether the right at issue "was clearly established in the specific context of the case—that is, whether it was clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted." *Merchant v. Bauer,* 677 F.3d 656, 662 (4th Cir. 2012) (citations and brackets omitted). Although courts may consider the two inquiries in whatever sequence best suits the "circumstances in the particular case at hand," *Pearson,* 555 U.S. at 236, it is preferable to consider first whether the conduct at issue violated a constitutional right because such determinations advance "the law's elaboration from case to case" by setting forth principles that can later become the basis for a holding that a right is clearly established. *Saucier,* 533 U.S. at 201; *Pearson* 555 U.S. at 236 (stating that the *Saucier* approach, though not mandatory, "is often beneficial").

As for the second prong, "[a] right is clearly established only if its contours are sufficiently clear that 'a reasonable official would understand that what he is doing violates that right.'" *Carroll v. Carman*, 135 S. Ct. 348, 350 (2014) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* (quoting *Ashcroft v. al–Kidd,* 131 S. Ct. 2074, 2083 (2011)). In determining whether a right is clearly established, it is not necessary for a court to have previously considered the exact facts at issue, or that there be a case involving "fundamentally similar" facts, so long as "in light of the pre-existing law the unlawfulness [is] apparent." *Hope v. Pelzer,* 536 U.S. 730, 739 (2002). Thus, "officials can still be on notice that their conduct violates established law even in novel factual circumstances," as long as the law

gave the defendant official "fair warning" that the conduct was unconstitutional. *Id.* at 740-41. Furthermore, because the issue is whether an official should have known that his conduct violated a constitutional right, whether a right is "clearly established" for purposes of qualified immunity must be determined in light of the law at the time the contested action was taken. *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1245 (2012).

## II.   First Amendment Claims

In Count I of his Complaint, Garcia asserts that Officers Baxter and Malouf violated his First Amendment rights in two ways: (1) by arresting him for video recording police in the public performance of their duties; and (2) by confiscating his video card and never returning it. Garcia seeks compensatory damages and a declaratory judgment that his First Amendment rights were violated. Officers Baxter and Malouf move for summary judgment on Count I on the basis qualified immunity. For his part, Garcia cross-moves for summary judgment on Count I, claiming that his arrest and the seizure of his video card violated the First Amendment as a matter of law.

### A.   Arrest for Video Recording Police Activity

Officers Baxter and Malouf claim qualified immunity from a damages claim relating to the alleged arrest of Garcia for video recording police activity because, they assert, (1) they did not violate any constitutional right to video record police activity; or (2) even if there was such a violation, the right to record public police activity was not "clearly established" at the time of the incident on June 16, 2011. Although the Court finds that there is a constitutional right to video record public police activity, it concludes that the right was not clearly established in this jurisdiction at the time of the incident, and so grants qualified immunity to the officers on the First Amendment damages claim.

### 1.    Violation of the First Amendment

Garcia asserts that the officers violated his First Amendment right to video record police officers in the routine public performance of their duties. The United States Supreme Court has not yet spoken on whether this is a right protected by the First Amendment, but two lines of Supreme Court precedent, read together, make clear that journalists and citizens alike have such a right. First, the Supreme Court has stated, in the context of journalists seeking access to non-public government information, that "[t]here is an undoubted [First Amendment] right to gather news 'from any source by means within the law.'" *Houchins v. KQED, Inc.*, 438 U.S. 1, 11 (1978) (quoting *Branzburg v. Hayes*, 408 U.S. 665, 681-82 (1972)). In *Houchins*, an inmate at a local prison committed suicide, a newsworthy event, which prompted journalists to seek information about conditions inside the facility. *Id.* at 3. The right to film police officers in the public performance of their duties is certainly suggested, but not wholly established, by the First Amendment right to gather news. Here, the right at issue is of a broader scope than the right of journalists to follow a newsworthy story. It is the right to record something that is not itself newsworthy—police officers in the routine performance of their duties—but that may become newsworthy.

This latter aspect of the right implicates a second line of Supreme Court cases. The Supreme Court has held that the protection and promotion of "the free discussion of governmental affairs" is a paramount First Amendment interest. *Mills v. Alabama*, 384 U.S. 214, 218 (1966). Significant to that right, indeed of "highest importance," are the aims of "preventing corruption and sustaining the active alert responsibility of the individual citizen in a democracy for the wise conduct of government." *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 788-89 (1978). Thus, recording governmental activity, even if that activity is not immediately

newsworthy, has the potential to prevent government abuses through scrutiny or to capture those abuses should they occur. As Garcia stated, recording police activity enables citizens to "keep them honest," an undertaking protected by the First Amendment.

The United States Court of Appeals for the Fourth Circuit has not addressed in a published opinion whether there is a First Amendment right to record public police activity. However, other circuits confirm that this right exists. In a case with similar facts, the United States Courts of Appeals for the First Circuit relied on these two strands of Supreme Court precedent to hold that a citizen who recorded on his cell phone both video and audio of police officers arresting an individual on the Boston Common, the nation's oldest public park, had a First Amendment right to record the arrest. *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011). The First Circuit reasoned that, "[g]athering information about government officials in a form that can readily be disseminated to others serves a cardinal First Amendment interest in protecting and promoting the free discussion of governmental affairs." *Id.* (internal quotation marks and citation omitted); *see also Gericke v. Begin*, 753 F.3d 1, 7-8 (1st Cir. 2014) (holding that an arrest of a citizen for illegal wiretapping when she recorded a traffic stop without interfering with the police activity violated her First Amendment rights).

Likewise, in *American Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583 (7th Cir. 2012), the United States Court of Appeals for the Seventh Circuit enjoined the enforcement of a state anti-eavesdropping statute against the audiovisual recording of police officers performing their duties in public because "[a]udio recording is entitled to First Amendment protection," and such protection includes "prohibit[ing] government from limiting the stock of information from which members of the public may draw." *Id.* at 597 (quoting *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978)). Other circuits, too, have found a general First Amendment

right to record the public activities of police officers and government officials. *See, e.g.*, *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) (holding that plaintiffs "had a First Amendment right, subject to reasonable time, manner and place restrictions, to photograph or videotape police conduct"); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995) (recognizing a "First Amendment right to film matters of public interest" in a case where police officers interfered with a citizen seeking to film a public demonstration directed in part against the police). *But see Kelly v. Borough of Carlisle*, 622 F.3d 248, 262-63 (3d Cir. 2010) (holding, for purposes of qualified immunity, that it was not clearly established that citizens have a First Amendment right to videotape a traffic stop).

Thus, based on the Supreme Court precedent finding First Amendment rights to gather the news and to engage in free discussion of governmental affairs to advance the wise and honest conduct of government, as well as the precedent from other circuits explicitly finding a First Amendment right to record public police activities, this Court finds that video recording of police activity, if done peacefully and without interfering with the performance of police duties, is protected by the First Amendment. As discussed below, there is a genuine issue of material fact whether Officers Baxter and Malouf violated that right when they arrested Garcia. *See infra* Part II.C.

### 2.      Clearly Established Right

Although the Court finds a constitutional right to video record public police activities, Officers Baxter and Malouf would still be entitled to qualified immunity if that right was not clearly established at the time of the incident in June 2011.[2] The Fourth Circuit has held that to

---

[2]  Garcia asserts that because the Court (Motz, J.) stated at the Motion to Dismiss stage that the right to film law enforcement officers in the public discharge of their duties is a "well-

determine whether a right was clearly established at the time of the alleged violation, courts "need not look beyond the decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose." *Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (4th Cir. 1999). Thus, "[i]f a right is recognized in some other circuit, but not in this one, an official will ordinarily retain the immunity defense." *Id.*

Here, none of delineated controlling sources clearly establish that, as of 2011, citizens had a right to record police officers in the routine public performance of their duties. As explained above, the Supreme Court has not spoken directly on the issue. The Fourth Circuit, in its only foray into this area, affirmed in an unpublished opinion a district court's determination that "the right to record police activities on public property was not clearly established in this circuit at the time of the alleged conduct" and did not opine one way or the other on whether such a First Amendment right exists. *Szymecki v. Houck*, 353 F. App'x 852, 853 (4th Cir. 2009). Thus, as of the incident in 2011, and even today, the Fourth Circuit has not provided police officers with fair warning that it is unconstitutional to stop someone from video recording the police in the routine public performance of their duties. Nor has the Maryland Court of Appeals weighed in on the issue.

---

established liberty safeguarded by the First Amendment," Mem. Op. at 6, ECF No. 20 (quoting *Glik v. Cunniffe*, 655 F.3d 75, 85 (1st Cir. 2011)), it is the law of the case that such a right is clearly established for purposes of qualified immunity. However, the law of the case doctrine does not apply here because in resolving Defendants' Motion to Dismiss, the Court did not squarely address the issue whether Officer Baxter and Officer Malouf had qualified immunity. *See* Mem. Op. at 5-6; *MacDonald v. Moose*, 710 F.3d 154, 161 n.10 (4th Cir. 2013) ("[T]he doctrine of law of the case restricts a court to legal decisions it has made on the same issues in the same case."). Furthermore, any ruling on qualified immunity at the motion to dismiss stage does not necessarily preclude revisiting the issue at the summary judgment stage. *Behrens v. Pelletier,* 516 U.S. 299, 309 (1996) (stating that "the relevant factors bearing upon the [qualified immunity] question will be different on summary judgment than on an earlier motion to dismiss.").

Despite this dearth of controlling case law, Garcia argues that the right was clearly established at the time of the events at issue because the right is self-evident from existing Supreme Court case law. In particular, he invokes the First Circuit's opinion in *Glik*, which concluded that a First Amendment right to film public police activities was clearly established, based in part on the two lines of Supreme Court cases discussed above. Crucially, however, the First Circuit did not base its conclusion solely on its analysis of general Supreme Court principles; rather, it also relied heavily on its own prior case, *Iacobucci v. Boulter*, 193 F.3d 14 (1st Cir. 1999), in which the court found that a journalist who was arrested for disorderly conduct after refusing to stop filming a meeting of a historic district commission had been acting "in the exercise of his First Amendment right," and that the officer "lacked any authority to stop" the filming. *Glik*, 655 F.3d at 83 (citing *Iacobucci*, 193 F.3d at 25). Thus, by the time of *Glik*, the First Circuit had laid the groundwork for the determination that the right to film police officers in the public performance of their duties is a clearly established right under the First Amendment.[3] No such legal trail exists in Supreme Court or Fourth Circuit precedent.

The fact that, in 2011, the Montgomery County Police Department had a policy on media relations directing that "to the extent possible, members of the media should be treated as invited guests at incident scenes," and that "no police officer shall take any action to prevent or interfere with the news media in photographing or televising an event," does not alter the analysis. Cross-Mot. Sum. J. Ex. 11 at 1-2, ECF No. 63-13. A public relations mandate from one's employer, designed to "enhance [the Department's] image and reputation," is not the same as a constitutional right. *Id.* While Officers Baxter and Malouf might have been aware of what the

---

[3] Notably, *Glik* was decided on August 26, 2011, more than two months after the June 16, 2011 incident, and thus could not itself contribute to a finding that a First Amendment right to record public police activities was clearly established at the time of the relevant events.

media could be invited to do, that knowledge is not a substitute for a clear understanding of what the media or individual citizens have a *right* to do in terms of recording police activity.

As discussed above, based on the fairest reading of Supreme Court precedent, and the great weight of authority from other circuits, it seems fairly well-settled in 2015 that there is a First Amendment right to video record police officers as they carry out their public duties. But the Fourth Circuit has specifically identified the sources from which a clearly established right can be identified, and as of 2011—and still today—none of the three identified courts has held that citizens have a right to record police officers as they perform their routine duties. Indeed, the Fourth Circuit, albeit in an unpublished opinion, expressly stated that this right is not clearly established. *Szymecki*, 353 F. App'x at 853. Thus, the Court must conclude that the right to record police officers in the routine public performance of their duties was not clearly established in this Circuit at the time of the events at issue in this case. Officers Baxter and Malouf are therefore entitled to qualified immunity from a suit for damages on this aspect of Garcia's First Amendment claim.

### B.  Seizure of the Video Card

Garcia also alleges that his First Amendment rights were violated because Officer Malouf removed Garcia's video card from his camera, presumably in order to prevent disclosure of its contents, and never returned it. Garcia's First Amendment claim is alleged against both Officers Baxter and Malouf. However, when the facts are construed in Garcia's favor, they establish that Officer Malouf alone purposefully examined Garcia's camera to try to locate the video card, that he found the video card and removed it, and that he then never returned that video card to Garcia. There are no facts connecting Officer Baxter to seizure of the video card. Officer Baxter is therefore entitled to summary judgment on this aspect of Garcia's First Amendment claim.

Officer Malouf seeks summary judgment on this aspect of Garcia's claim, again on the basis of qualified immunity. He does not offer an independent basis for this contention, instead recycling his assertion that, at the time of the incident, there was no clearly established First Amendment right to record police "in a manner which interfered with police operations." Mot. Sum. J. at 29. Officer Malouf proceeds as if the questions whether there is a First Amendment right to record police activity, and whether there is a First Amendment right not to have any such recording seized in order to prevent the dissemination of its content, are effectively the same. These questions, however, are distinct enough to require separate consideration of whether Officer Malouf has qualified immunity for Garcia's First Amendment claim relating to the seizure of the video card. As set forth below, the Court finds that the First Amendment protects against the seizure of a recording of police activity in order to prevent its public dissemination, but concludes that the right was not clearly established in this jurisdiction at the time of the incident, and so grants qualified immunity to Officer Malouf on this aspect of Garcia's First Amendment damages claim.

### 1. Violation of the First Amendment

In *Roaden v. Kentucky*, 413 U.S. 496 (1972), the Supreme Court navigated the intersection between the First and Fourth Amendments and determined that when an officer seizes material that "arguably" falls within First Amendment protection, and does so "without the authority of a constitutionally sufficient warrant," then that seizure is "plainly a form of prior restraint." *Id.* at 504 (finding that police seizure of an adult film believed to be obscene was an unconstitutional prior restraint). A prior restraint of "speech [or] publication" is the "most serious and the least tolerable infringement on First Amendment rights. *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).

In *Rossignol v. Voorhaar*, 316 F.3d 516 (4th Cir. 2003), the Fourth Circuit applied this principle to the context of police activity. In *Rossignol*, Sheriff's Department deputies, on the eve of an election, purchased all available copies of a newspaper that had been critical of the Sheriff's Department. *Id.* at 519-21. The Fourth Circuit held that the deputies' "seizure" of the newspaper had "clearly contravened the most elemental tenets of First Amendment law." *Id.* at 521. The deputies had "suppress[ed]" the paper because "they disagreed with its viewpoint," making their violation of the First Amendment "all the more blatant." *Id.*

Here, as discussed above, the video recording of public police actions is an activity protected by the First Amendment, so it follows that the recording itself is First Amendment-protected material akin to a film or written publication. Following the reasoning of *Roaden* and *Rossignol*, the seizure of the recording, if done for the purpose of preventing the dissemination of the information on the recording, would constitute an unconstitutional prior restraint. *See Roaden*, 413 U.S. at 504; *Rossignol*, 316 F.3d at 521. The Court therefore holds that the First Amendment protects against the seizure and retention of a video recording of public police activities if the seizure was for the purpose of preventing the public dissemination of the contents of that recording.

When the evidence is viewed in the light most favorable to Garcia, a reasonable jury could conclude that Officer Malouf engaged in just such an unlawful prior restraint. Garcia asserts that Officer Malouf, after observing Garcia taking video of the police action of arresting two suspects, removed the video card from Garcia's camera, put it in his pocket, and never returned it. There is also evidence, from Garcia's testimony and that of Grajeda and Williams, that Garcia informed the officers that he was a member of the press. These two facts together support the inference that Officer Malouf, knowing Garcia was a journalist, saw the potential for

the recording to be circulated and thus seized and kept the video card to ensure that such circulation could not occur.   If true, such a seizure would constitute an unconstitutional prior restraint and would violate the First Amendment.

### 2.    Clearly Established Right

As noted above, based on Supreme Court and Fourth Circuit precedent predating 2011, it was clearly established that government officials, including police officers, violate the First Amendment if they seize newspapers, films, or other First Amendment-protected materials in order to prevent the dissemination of their content. *See Roaden*, 413 U.S. at 504; *Rossignol*, 316 F.3d at 521.   However, under this precedent, the Court cannot conclude that Officer Malouf had "fair warning" that his actions violated Garcia's First Amendment rights.   Both *Roaden*, which involved police seizing an adult film to prevent its public showing, and *Rossignol*, which involved a law enforcement effort to prevent the distribution on Election Day of newspapers containing information critical of candidates supported by the sheriff's department, involved quintessential First Amendment material. *See Roaden*, 413 U.S. at 504; *Rossignol*, 316 F.3d at 521.   In fact, the films in *Roaden* and the newspapers in *Rossignol* were items already intended for and in public circulation, but which were taken out of circulation by law enforcement.

Here, however, Garcia's recording was not of something newsworthy—the kind of recording almost certain to enter public circulation—but a recording made on the chance that something newsworthy might happen.   There is therefore no easy analogy to be drawn between *Roaden* and *Rossignol* and the facts in this case.   Although a right may be clearly established even in the absence of case law involving the exact or "fundamentally similar" facts, *Hope*, 536 U.S. at 739, and "officials can still be on notice that their conduct violates established law even in novel factual circumstances," *id.* at 740-41, the scenario at issue here differs from the

24

controlling case law in one material way:  the seized item was not one that was clearly protected by the First Amendment.  Because it was not clearly established in the Fourth Circuit in 2011 that recording routine police activity was protected by the First Amendment, it also could not have been clearly established in 2011 that the product of that recording was entitled to the same First Amendment protections applicable to newspapers and films sold or displayed to the public. To be sure, under Garcia's version of events, it would be difficult to justify the seizure and retention of the video card as constitutional.  But, as discussed below, the well-traveled path to that conclusion runs through the Fourth Amendment, not the First Amendment.  *See infra* Part IV.B.  Thus, the Court grants qualified immunity to Officer Malouf on the First Amendment damages claim relating to the seizure of the video card.

Because the Court finds that that the officers are entitled to qualified immunity on Count I, Defendants' motion for summary judgment on the claim for damages is granted, and Garcia's cross motion for summary judgment on the same issue is denied.

C.  **Declaratory Judgment**

In Count I, Garcia also seeks a declaratory judgment that his arrest "for video-recording police activity in a public location" and "the permanent deprivation of the video card" violated his First Amendment rights.  Compl. at 22; Cross Mot. Sum. J. at 10.  The Court's finding that the officers are entitled to qualified immunity does not resolve this issue because qualified immunity protects government officials only from claims for damages.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 819 n. 34 (1982) (holding that qualified immunity shields government officials from "liability for civil damages" and "express[ing] no view as to the conditions in which injunctive or declaratory relief might be available"); *see Pearson v. Callahan*, 555 U.S. 223, 242 (2009) (stating that the defense of qualified immunity is "not available" in "§ 1983

cases where injunctive relief is sought instead of or in addition to damages"); *Wood v. Strickland*, 420 U.S. 308, 314 n. 6 (1975) (noting, in the context of absolute immunity in a § 1983 case, that "immunity from damages does not ordinarily bar equitable relief as well"); *Young v. Lynch*, 846 F.2d 960, 962 (4th Cir. 1988) (noting, in deciding whether an order denying qualified immunity is immediately appealable, that "an official who is granted qualified immunity from liability from damages probably will remain in the case as trial proceeds on the equitable issues").

Claims in federal court for a declaratory judgment are governed by the Declaratory Judgment Act, 28 U.S.C. § 2201. "[D]istrict courts have discretion in determining whether and when to entertain an action under the Declaratory Judgment Act." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995) (citing *Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491, 494 (1942)). There is "nothing automatic or obligatory about the assumption of jurisdiction by a federal court to hear a declaratory judgment action." *Id.* at 288 (internal quotation marks and citation omitted). Instead, a district court should hear a declaratory judgment action "when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue," *Centennial Life Ins. Co. v. Poston*, 88 F.3d 255, 256 (4th Cir. 1996), but only when doing so is the prudent course in light of "considerations of practicality and wise judicial administration," *Wilton*, 515 U.S. at 288.

Here, resolving Garcia's declaratory judgment claim serves a useful purpose. A finding whether the officers' actions violated the First Amendment may facilitate the resolution of the bifurcated claim against Montgomery County in which Garcia seeks injunctive relief requiring a new policy to prevent First Amendment violations. At the same time, practicality and wise judicial administration also weigh in favor of hearing Garcia's declaratory judgment claim.

Certainly, if this were the only remaining claim, or if it were expected that other related claims would be resolved in a different forum, it may not be appropriate to expend judicial resources to conduct a trial to resolve it. *See Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491, 495 (1942) (holding that the district court did not abuse its discretion in declining to exercise jurisdiction under the Declaratory Judgment Act because "another proceeding was pending in a state court in which all the matters in controversy between the parties could be fully adjudicated"); *Centennial*, 88 F.3d at 256 (noting that a declaratory judgment action should "not be used to try a controversy by piecemeal, or to try particular issues without settling the entire controversy") (internal quotation marks and citation omitted)). But, as discussed below, all of Garcia's other claims will need to go before a trier of fact for resolution. Because the ensuing litigation on those claims involves the same parties and evidence at issue in Garcia's First Amendment claims, the additional resources required to resolve the declaratory judgment claim at the same time would be quite limited. The Court, in an exercise of its discretion, thus chooses to entertain Garcia's declaratory judgment claim contained in Count I of the Complaint.

Having determined that it is appropriate to hear Garcia's declaratory judgment claim, the Court turns to whether summary judgment on that claim is appropriate. Although the Court has held that citizens have a First Amendment right to video record public police activities, and that confiscation of a video card or other recording of such police activity would violate the First Amendment, there remain several genuine issues of material fact relating to Garcia's specific claim that, in this case, Officers Baxter and Malouf violated those rights. Garcia asserts that up until his arrest, he was calm and cooperative and so concludes that Officer Malouf must have arrested him *because* he was recording police activity, in violation of his First Amendment rights. Officer Malouf asserts that when he approached Garcia, Garcia immediately became

27

belligerent and, despite Officer Malouf's repeated efforts and warnings to get him to calm down, only became more disruptive and combative. According to Officer Malouf, he arrested Garcia not for filming police activity, but for disturbing others around him. Likewise, although Garcia asserts that Officer Baxter's spotlighting of him multiple times, including after he had determined that Garcia was holding a camera and posed no threat to him or the other officers on the scene, interfered with his First Amendment right to record the police activity, Officer Baxter maintains that he trained his spotlight on Garcia out of safety concerns. According to Baxter, Garcia repeatedly positioned himself in dark areas, making it difficult, if not impossible, for Baxter or other officers to see what he was doing or what he was holding. Thus, there are genuine issues of material fact relating to whether Officers Baxter and Malouf interfered with Garcia's First Amendment rights. To make a determination on whether the officers violated Garcia's First Amendment rights before and during his arrest would require a trier of fact to sift through and weigh these opposing factual accounts.

As for Garcia's First Amendment claim relating to the seizure of the video card, little needs to be said. Garcia insists that Officer Malouf took the card and did not return it. Officer Malouf denies the allegation. If the card was not seized, there would be no First Amendment violation. Plainly, no declaratory judgment is possible without presenting that issue to a trier of fact.

Because of these genuine issues of material fact, the Court denies summary judgment to Defendants and Garcia on the claim for a declaratory judgment that the arrest of Garcia and the seizure of his video card violated his First Amendment rights.

### III. First Amendment Retaliation Claim

In Count II, Garcia alleges that Officers Baxter and Malouf retaliated against him for filing a complaint with the MCPD Internal Affairs Division and for filing this lawsuit, in violation of Garcia's First Amendment rights. The officers seek summary judgment on this claim, asserting that (1) Garcia does not have a First Amendment right to file an Internal Affairs complaint or this lawsuit; (2) Garcia has failed to allege facts sufficient for a reasonable jury to find in his favor on a retaliation claim; and (3) any right was not adversely impacted because Garcia was not deterred from filing his Internal Affairs complaint or this lawsuit.

The First Amendment right of free speech "includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). "Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights." *Am. Civil Liberties Union of Md., Inc. v. Wicomico Cnty.*, 999 F.2d 780, 785 (4th Cir. 1993). A plaintiff seeking to recover on a First Amendment retaliation claim must prove the following: (1) the plaintiff engaged in protected First Amendment activity, (2) the defendants took some action that adversely affected the plaintiff's First Amendment rights, and (3) there was a causal relationship between the protected activity and the defendants' conduct. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005).

The first element presents a pure question of law. Contrary to Defendants' assertion, Garcia's filing of an Internal Affairs complaint and this lawsuit are activities protected by the First Amendment. Citizens have a First Amendment right "to appeal to courts and other forums established by the government for resolution of legal disputes." *Borough of Duryea, Pa. v.*

*Guarnieri*, 131 S. Ct. 2488, 2494 (2011). This right of private citizens to petition for the redress of grievances "extends to all departments of the Government," particularly, as here, when the grievance is a matter of public concern because it involves allegedly unlawful actions of police officers. *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972); *see Constantine*, 411 F.3d at 499 (holding that the plaintiff's complaints about her exams to administrators at her public law school, which she later reiterated in the law school newspaper, were protected First Amendment activity); *see also Gable v. Lewis*, 201 F.3d 769, 771 (6th Cir. 2000) (citing *California Motor Transport* in determining that a tow truck company owner had a First Amendment right to file a complaint with "nonjudicial public agencies like a police department," specifically with the state Highway Patrol, regarding sex discrimination in the assignment of towing jobs). Garcia thus satisfies the first element.

On the second element, Defendants assert that Garcia "has developed no facts to support his theory of retaliation." Mot. Sum J. at 32. Garcia, however, has presented such facts as to Officer Malouf. In his response to Defendants' interrogatories, Garcia stated that during a one-week period in early December 2011, which was around the time of his trial on the disorderly conduct charge, he twice saw Officer Malouf parked across the street from his home, in front of the house that Officer Malouf had "mistakenly entered as [Garcia's] address" on the June 16, 2011 police report. Cross-Mot. Sum. J. Ex. 5 at 7-8. While Officer Malouf points out that Garcia's street is a frequently used shortcut and also that officers are regularly called to a nearby nursing home, those responses do not explain why Officer Malouf parked on Garcia's street, rather than driving through or parking at the nursing home. Nor do they explain why, as Garcia alleges, Officer Malouf would be twice parked in the same spot, a spot right outside the address he had recorded as Garcia's.

Garcia also asserts that since he began pursuing his complaints related to this incident, he has seen other police cruisers parked in front of his home on more than one occasion. For example, he has video evidence that on March 19, 2013, Officer Barros was parked on his street, in a location near where he had seen Officer Malouf. Officer Barros has stated that he was there to do paperwork, but he told Garcia that he wanted to "check up on" him. Cross Mot. Sum. J. Ex. 19 at 8-9. Although Garcia has no evidence specifically linking Officer Malouf to Officer Barros, his interaction with Officer Barros provides additional support for his claim that Officer Malouf, with the help of other MCPD officers, engaged in a coordinated effort to intimidate him. Officer Malouf may well contend that he never parked on Garcia's street, or that he had a reason to park there unrelated to Garcia, but it is for a trier of fact to determine who is credible on that score.

The second element also requires that the alleged retaliatory action adversely affect the plaintiff's First Amendment rights. Defendants assert that because Garcia actually filed his Internal Affairs complaint and the instant lawsuit, he cannot show that any alleged retaliatory actions adversely affected his First Amendment rights. This argument requires little attention. "[A] plaintiff need not actually be deprived of . . . First Amendment rights in order to establish First Amendment retaliation." *Constantine*, 411 F.3d at 500. The test is an objective one: an action adversely affects a plaintiff's First Amendment rights if the action "would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Id.* (internal quotation marks and citation omitted). Under Garcia's account, he twice saw Officer Malouf sitting in a parked police cruiser across the street from the house that Officer Malouf likely believed to be where Garcia lived, and he saw a number of other police officers do the same, including Officer Barros, who remarked to Garcia that he was there to "check up" on him.

Viewed in the light most favorable to Garcia, this gratuitous show of uninvited law enforcement interest, if true, would certainly be enough to chill others from lodging complaints against police officers.

The third element of the retaliation claim, that there was a causal relationship between the plaintiff's activity and the defendant's conduct, generally requires that the defendant was aware of the protected activity and that there was some sort of temporal proximity between the protected activity and the alleged retaliation so as to suggest a causal connection. *Constantine*, 411 F.3d at 501. Defendants do not claim that there was a lack of temporary proximity. Rather, their argument on causation largely folds into the arguments on the second element. They contend that to the extent police officers drive down Garcia's street, it is likely because that street is on the way to and from a nursing home or other locations to which Montgomery County Police Officers are regularly called. Again, Officer Malouf provides no explanation for why he or other officers would park in front of Garcia's house rather than simply pass by en route to other locations. Regardless, whether Malouf parked in front of Garcia's house and whether he did so in order to retaliate for Garcia's complaints are genuine issues of material fact not to be resolved on summary judgment.

Although the Court finds sufficient evidence to support a retaliation claim against Officer Malouf, it does not find such evidence relating to Officer Baxter. Unlike for Officer Malouf, Garcia has no evidence that Officer Baxter ever parked outside of Garcia's home. The only direct evidence involving Officer Baxter that arguably relates to retaliation are text messages between Officers Baxter and Graves in which they discuss Garcia's criminal prosecution and Garcia's later lawsuit. While these text messages show that Garcia was a topic of discussion between those officers, that is all they show. There is no mention of a plan to make their

presence known on Garcia's street or otherwise to harass him.  In the absence of anything directly tying Officer Baxter to any retaliatory activity, Garcia's evidence that other officers parked outside his home cannot be the basis for establishing a retaliation claim against Officer Baxter.  Garcia himself essentially recognizes this deficiency, arguing that it "would not be a far leap for the jury to infer" that Officer Baxter's texts about Garcia indicate his involvement in "a broader effort at attempted retaliation."  Cross Mot. Sum. J. at 42.  On summary judgment, however, "[i]t will not do to presume the missing facts," yet such a presumption is precisely what is involved in the leap that Garcia proposes. *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 888-89 (1990) (stating that "general averments" are not enough to create a material dispute of fact).  The Court therefore grants the Motion for Summary Judgment on the retaliation claim as to Officer Baxter, but denies it as to Officer Malouf.

## IV.     Fourth Amendment Claim

In Count III, Garcia asserts that his arrest and the seizure of his camera and video card violated the Fourth Amendment because Officer Malouf lacked probable cause to arrest him for disorderly conduct or any other charge.  Officer Malouf seeks summary judgment on this claim, asserting that the undisputed facts establish that he had probable cause to arrest Garcia for a Maryland criminal offense, either hindering an arrest or second-degree assault, and that even if he lacked probable cause for the arrest, he is entitled to qualified immunity on the Fourth Amendment claim.  Garcia, for his part, seeks summary judgment in his favor, arguing that as a matter of law there was no probable cause to arrest him for disorderly conduct, hindering an arrest, or second-degree assault, such that his arrest, and the seizure of his camera and video card incident to that arrest, were unconstitutional.

### A.    Probable Cause to Arrest

With limited exceptions, "seizures are reasonable only if supported by probable cause." *Dunaway v. New York*, 442 U.S. 200, 214 (1979) (internal quotation marks omitted).  An officer has probable cause for an arrest when "facts and circumstances within the officer's knowledge would warrant the belief of a prudent person that the arrestee had committed or was committing an offense." *United States v. Manbeck*, 744 F.2d 360, 376 (4th Cir. 1984) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).  As the term implies, probable cause involves "probabilities," the "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)).  Thus, probable cause requires more than mere suspicion, but less than proof beyond a reasonable doubt. *See Wong Sun v. United States*, 371 U.S. 471, 479 (1963).  "The question to be answered is whether an objectively reasonable police officer, placed in the circumstances, had a 'reasonable ground for belief of guilt' that was 'particularized with respect to the person to be searched or seized.'" *United States v. Humphries*, 372 F.3d 653, 657–58 (4th Cir. 2004) (quoting *Maryland v. Pringle*, 540 U.S. 366, 372–73 (2003)).  The arresting officer's belief need not be correct or even more likely true than false, so long as it is reasonable. *Texas v. Brown*, 460 U.S. 730, 742 (1983).  Furthermore, the officer's subjective motivations for making the arrest are immaterial. *Whren v. United States*, 517 U.S. 806, 813 (1996).

### 1.  Disorderly Conduct

Although Officer Malouf moves for summary judgment on Garcia's claim that the arrest violated the Fourth Amendment, he acknowledges that, in light of Garcia's contention that he was behaving peaceably before he was arrested, there may be a "question of fact as to whether Officer Malouf had probable cause to arrest [Garcia] for disorderly conduct." Mot. Sum. J. at

35.    Officer Malouf primarily argues that he had probable cause to arrest Garcia for two other offenses.  It is therefore only Garcia who asserts that he is entitled to summary judgment on the question whether Officer Malouf had probable cause to arrest him for disorderly conduct.

In Maryland, "[a] person from any location may not, by making an unreasonably loud noise, willfully disturb the peace of another . . . in a public place."  Md. Code Ann. Crim. L. § 10-201(c)(5)(i) (2012).  In addition, "[a] person may not willfully fail to obey a reasonable and lawful order that a law enforcement officer makes to prevent a disturbance to the public peace."  *Id.* § 10-201(c)(3).  To do either of these things would constitute disorderly conduct.  Garcia, focusing on the first form of disorderly conduct, asserts that Officer Malouf lacked probable cause to arrest him for disorderly conduct because the "brevity" of his interactions with Officer Malouf meant that he could not have disturbed the peace in any "meaningful" way.  Cross Mot. Sum. J. at 23.  According to Garcia, Officer Malouf arrested him "[a]lmost immediately" after approaching him.  *Id.*  Officer Malouf, however, contends that Garcia yelled for several minutes before he ultimately arrested Garcia for disorderly conduct, a step he took only after repeatedly instructing Garcia to quiet down and warning him that he might be arrested if he did not do so.  There is thus a material dispute of fact relating to the length of Garcia's interactions with Malouf, the volume of Garcia's protests, and whether they disturbed others prior to his arrest, such that summary judgment in favor of Garcia on this issue would be inappropriate.

More significantly, Garcia asserts that anything he said was a "verbal protest against illegal police orders" and was therefore protected by the First Amendment.  *Id.* at 24.  In support of this proposition, Garcia relies on *Diehl v. State*, 451 A.2d 115 (Md. 1982).  In *Diehl*, the passenger of a car stopped by the police got out, only to be instructed by the police officer to return to the vehicle.  In response, the passenger "began yelling," including using profanity, "said

35

that he knew his rights, and said that [the officer] could not tell him to get back into the car." *Id.* at 116. After the officer warned him that he would be arrested if he did not get back into the car, and passers-by began to stop and watch, the passenger was arrested for, and later convicted of, disorderly conduct. *Id.* at 116-17.

On appeal, the State argued that the conviction was valid because Diehl's protests amounted to "loud and unseemly noises." *Id.* at 118; *see* Md. Code Art. 27 § 121 (repealed 2002); Md. Code Ann. Crim. L. § 10-201(c)(5) (replacing Md. Code Art. 27 § 121 and making it illegal to "mak[e] an unreasonably loud noise" that "willfully disturb[s] the peace of another"). The Maryland Court of Appeals vacated the conviction, holding that where a person "is acting in a lawful manner . . . and is the object of an unlawful police order, it is not usually a criminal violation for such person to verbally protest a police officer's insistence upon submission to such an order." *Id.* at 122. Instead, the Court explained, such verbal protests are speech protected by the First Amendment and so cannot serve as the basis for a disorderly conduct arrest unless they "advocate[] imminent lawless action" and are "likely to incite a breach of the peace." *Id.* at 119.

The Maryland Court of Appeals has since clarified the scope of *Diehl*. In *Eanes v. State*, 569 A.2d 604 (Md. 1990), the Court returned to the issue of "loud and unseemly noise" and held that when police officers arrest individuals for disorderly conduct based solely on the volume of their speech—not its content—such arrests do not violate the First Amendment. *Id.* at 617-18. In reaching this determination, the *Eanes* court distinguished the arrest in *Diehl* as one made "based on [the] allegedly objectionable content" of the passenger's speech, not on the passenger's volume. *Id.* at 608. The court identified three factors to consider in assessing whether such an arrest was lawful: (1) whether the order was directed at the content of the speech or its volume; (2) the time and place where the speech occurs, including the appropriate

sound level for that location; and (3) whether there were alternative means for the arrestee to express a viewpoint. *Id.* at 612-13. Recognizing, however, that disorderly conduct arrests can be tools for "oppressive action" on the part of government officials, the Court of Appeals indicated that any arrest for disorderly conduct based on the volume of an individual's speech had to be preceded by a "prior warning by police authority" that "further communication at the offensive volume level may subject the individual to prosecution" and "a complaint from an affected citizen upon the basis of which the officer reasonably believes that the statute has been violated." *Id.* at 617-18.

In *Polk v. State*, 835 A.2d 575 (Md. 2003), the Maryland Court of Appeals again dealt with the intersection of disorderly conduct and the First Amendment, specifically with the relationship between the prohibition on loud and unseemly noises and the provision making it illegal for a person to "willfully fail to obey a reasonable and lawful order that a law enforcement officer makes to prevent a disturbance to the public peace." Md. Code Art. 27 § 121, revised as Md. Code Ann. Crim. L. § 10-201(c)(3).[4]  In *Polk*, a former hospital employee picking up her final paycheck began to curse and yell at a special patrol officer who was delivering the check to the human resources department.  The officer instructed Polk to "keep [her] mouth quiet and leave." *Polk*, 835 A.2d at 577. As Polk made her way through the hospital, continuing to yell and curse, the officer warned her that she would be arrested for disorderly conduct if she did not stop. *Id.* At least two people "changed their direction to walk away" from her. *Id.* at 578.

---

[4]  The revised provision, enacted in October 2002, was in effect by the time *Polk* was decided but not when the events at issue in the case occurred.  The two provisions are substantively the same, as the current statute was merely "new language derived without substantive change from former Art. 27 § 121." Md. Code Ann. Crim. L. § 10-201, Revisor's Note.  The new provision reads: "A person may not willfully fail to obey a reasonable and lawful order that a law enforcement officer makes to prevent a disturbance of the public peace." Md. Code Ann. Crim. L. § 10-201(c)(3).

When Polk persisted in screaming and cursing, the officer arrested Polk for disorderly conduct. *Id.* at 577, 583. Polk was later found guilty and appealed her conviction based on *Diehl. Id.* at 578. Applying the factors identified in *Eanes*, the Court of Appeals rejected her challenge based on its determination that the officer's orders to Polk to be quiet were lawful because they were directed at the volume, not the content, of Polk's speech; that the location of the encounter, a hospital, was a place where such a sound level was not appropriate; and that Polk had alternative means by which to express her views, such as speaking to hospital supervisor. *Id.* at 582-86. The court thus concluded that because the officer's orders to Polk were lawful, Polk's refusal to obey those orders constituted disorderly conduct. *Id.* at 579.

Here, when the facts are construed in the light most favorable to Officer Malouf, the key factual elements in *Polk* are arguably present. Specifically, Officer Malouf asserts that over the course of several minutes, he repeatedly instructed Garcia to "quiet down," but that Garcia refused to do so. Mot. Sum. J. Ex. 14 at 17-18. Officer Malouf and several other officers assert that Garcia's yelling drew their focus and the focus of about a dozen nearby people. And Efigenia Rashid stated that Garcia yelled so loudly that, although her car windows were rolled up, the noise distracted her from the game she was playing on her tablet. Officer Malouf contends that it was only after Garcia's repeated refusals to calm himself down, and after Officer Malouf warned him several times that if he failed to do so he could be arrested for disorderly conduct, that he ultimately placed Garcia under arrest.

Officer Malouf's statement that he repeatedly instructed Garcia to "quiet down" arguably establishes that his orders to Garcia were directed at the volume of Garcia's speech, not its content. Although the encounter with Garcia occurred on a public street, a place where there should be more tolerance for noise than the hospital in *Polk*, under a probable cause standard, the

apparent impact of Garcia's speech on members of the public may be sufficient to warrant the officer's intervention at that time and place. Garcia also likely had alternative means by which to express his discontent, such as by contacting MCPD supervisors directly. In light of *Polk*, and upon consideration of the *Eanes* factors, a reasonable jury could conclude that Officer Malouf had probable cause to arrest Garcia for disorderly conduct, and that the arrest did not infringe on Garcia's First Amendment rights. Alternatively, a reasonable jury could also conclude that the arrest for disorderly conduct lacked probable cause either because Garcia was not, in fact, disruptive in any way, or because the arrest was impermissibly based on the content of Garcia's speech. Because there is a legal theory by which Officer Malouf's arrest of Garcia for disorderly conduct could be deemed lawful, and there are adequate facts in the record to support that theory, the question whether Garcia was lawfully arrested for disorderly conduct cannot be resolved on summary judgment, but must instead be put before a trier of fact.

### 2. Obstructing or Hindering an Arrest

Officer Malouf argues that he is entitled to summary judgment on Count III because there was, as a matter of law, probable cause to arrest Garcia for a different offense: obstructing or hindering an arrest. *See Devenpeck v. Alford*, 543 U.S. 146, 155 (2004) (holding that an arrest is lawful if, based on the facts known to the arresting officer at the time, there is probable cause to arrest for *any* offense, not just the offense that was the basis for the arrest or offenses closely related to it). In Maryland, it is illegal to "interfere with an individual who the person has reason to know is a police officer who is making or attempting to make a lawful arrest or detention of another person." Md. Code Ann. Crim. L. § 9-408(b)(2). Maryland courts have explained that the crime of hindering an arrest has four elements: (1) a police officer engaged in the performance of a duty; (2) an act or omission by the defendant that obstructs or hinders the

officer in the performance of that duty; (3) knowledge that the police officer is engaged in the performance of a duty; and (4) intent to obstruct or hinder the officer. *Cover v. State*, 466 A.2d 1276, 1284 (Md. 1983).

Here, there is no question that Garcia was aware that Officers Baxter, Graves, and Malouf were police officers and that they were performing their duty in arresting the alcohol suspects. The first and third elements are therefore satisfied. The second and fourth elements, however, are more problematic. On the second element, it is undisputed that Garcia did not actually prevent the arrest of the two alcohol suspects. Instead, Officer Malouf's contention is that Garcia delayed those arrests—by about 40 minutes, according to Officer Baxter—and that such delay satisfies the second element. However, the Maryland Court of Appeals has indicated that merely delaying an arrest does not constitute hindering. In *In Re Antoine H.*, 570 A.2d 1239 (Md. 1990), the court held that evidence of a "delay in opening the door" to police officers to give a suspect time to hide, and of unbelieved lies to the officers about the suspect's presence on the premises, was insufficient to establish at trial the second element of the crime of hindering an arrest. *Id.* at 1243. The court reasoned that because the police officers ultimately found the suspect and arrested him, they were not "actually hindered or obstructed" in making the arrest. *Id.* at 1242.

Even if delaying an arrest could be deemed to establish the second element, Officer Malouf's argument founders on the fourth element. As Officer Malouf and his fellow officers recount the events of that night, Officer Malouf was called to the scene because Garcia was "in the shadows" at a distance too far away for Officers Baxter and Graves to discern exactly what he was doing. Mot. Sum. J. Ex. 1 at 17. The problem that the officers assert Garcia posed was thus not that he was actively or intentionally interfering in the arrest of the alcohol suspects, but

that he was a distraction. Even when the facts are construed in Officer Malouf's favor, there is no evidence that any disruption Garcia may have caused in the arrest of the two alcohol suspects was one he intended to cause. Instead, the undisputed evidence is that, before Officer Malouf arrived, Garcia stayed at least 35 feet away from the arrest scene and did not engage with the officers. Once Officer Malouf arrived, either, as Garcia tells it, Garcia remained calm, or, as Officer Malouf tells it, Garcia began to protest his *own* interaction with the police, not the arrest of the two alcohol suspects. To find that Officer Malouf had probable cause to arrest Garcia for hindering would thus be to mistake a possible *effect* of Garcia's video recording—the officers' distraction—for Garcia's *intent* in video recording. Notably, Garcia's core claim is that he had a right to record the events unfolding in front of him, a claim that is fundamentally at odds with the assertion that Garcia's intent was to thwart those events. Thus, the Court concludes that, even viewing the facts in the light most favorable to the defense, Officer Malouf did not have an objectively reasonable basis to believe that Garcia committed the offense of hindering an arrest and therefore did not have probable cause to arrest Garcia for that crime.

### 3. Second-Degree Assault

Lastly, Officer Malouf asserts that he had probable cause to arrest Garcia for second-degree assault. In Maryland, "assault" is defined as "the crimes of assault, battery, and assault and battery, which retain their judicially determined meanings." Md. Code Ann. Crim. L. § 3-201(b). One of those judicially determined meanings, and the one asserted here, is that an individual can commit an assault merely by "intentional[ly] frightening" someone, even absent physical contact. *Wieland v. State*, 643 A.2d 446, 464 (Md. 1994). Such an assault is a second-degree assault, Maryland's catch-all crime for assaults that are not committed with a firearm or

which do not involve intent to cause serious physical injury. *See* Md. Code Ann. Crim. L. §§ 3-202, 3-203 (defining first-degree and second-degree assault, respectively).

Officer Malouf's contention that he had probable cause to arrest Garcia for second-degree assault on an "intent to frighten" theory arises from Grajeda's assertion that he felt "threatened by [Garcia's] loud yelling while [Garcia] pointed his finger directly at Grajeda." Resp. Opp'n Cross Mot. Sum. J. at 22. This argument warrants scant attention. Second-degree assault based on an intent to frighten has three elements: (1) the defendant committed an act with the intent to place the victim in fear of immediate physical harm; (2) the defendant had the apparent ability at the time of the act to bring about the threatened physical harm; and (3) the victim was aware of the threat of physical harm. *Jones v. State*, 103 A.3d 586, 589 (Md. 2014). Here, Garcia's "act" was cursing and pointing in Grajeda's direction. Even when the facts are construed in Officer Malouf's favor, there is no reasonable basis to conclude that Garcia acted with the intent to place Grajeda in fear of immediate physical harm. No one heard Garcia make any threats of physical harm toward anyone. In fact, Grajeda acknowledged that Garcia's cursing was not even directed at him. According to Grajeda, he did not know exactly to whom Garcia was talking because "when you are yelling and screaming, 'Fuck this. Fuck that' …. Who am I speaking to? God?" Mot. Sum. J. Ex. 2 at 16. Garcia's pointing, which appears to have happened only once, was not accompanied by any other threatening gesture. Furthermore, even if Garcia did intend to cause Grajeda to fear for his safety, at the time Garcia supposedly indicated this intent, Officer Malouf was already on the scene, only feet away from Garcia. With Garcia already under the close observation of an armed police officer, whose sole purpose on the scene was to ensure that Garcia posed no threat, Garcia cannot be said to have had the "apparent ability" to carry out any supposed threats of physical harm. Officer Malouf therefore did not have an objectively

reasonable basis to believe that Garcia was committing, or intended to commit, second-degree assault and thus did not have probable cause to arrest him for that offense.

**B.      Probable Cause to Seize the Camera and Video Card**

In his Complaint, Garcia asserts that because his arrest was unlawful, the seizure of his camera and the video card were also unlawful.  Although both sides seek summary judgment on Count III, neither offers an argument on why it is entitled to summary judgment on this question, nor would summary judgment be appropriate.  Whether the camera and video card were lawfully seized depends, as a threshold matter, on the lawfulness of the arrest, and thus whether Officer Malouf was entitled to search Garcia incident to that arrest.  The lawfulness of the seizures thus folds analytically into the question of probable cause for the arrest, which as discussed above, cannot be decided on summary judgment.  *See United States v. Robinson*, 414 U.S. 218, 224 (1973) ("It is well settled that a search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment."); *Chimel v. California*, 395 U.S. 752, 763 (1969) ("[I]t is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction.").

Even then, the items could only be seized if there is a "nexus ... between the item to be seized and criminal behavior." *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 307 (1967). Garcia's claim that Officer Malouf seized and never returned the video card, if true, may establish a Fourth Amendment violation as a matter of law, because there is no apparent basis for the permanent seizure of the video card, particularly in light of Garcia's acquittal at trial on the disorderly conduct charge.  But there remains a material dispute of fact about the video card that is as sharp as one can be:  Garcia asserts that Officer Malouf took and retained the card; Officer

Malouf asserts that he did not. Thus, there is no basis to grant summary judgment to either party on the Fourth Amendment claim relating to the seizure of the camera and video card.

### C.      Qualified Immunity

Officer Malouf alternatively asserts that he has qualified immunity on Garcia's Fourth Amendment claims. Qualified immunity shields government officers from liability for damages if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818. At the summary judgment stage, Officer Malouf's qualified immunity argument fails. As discussed above, there exists a genuine issue of material fact whether Officer Malouf violated Garcia's Fourth Amendment rights. Moreover, it is beyond question that the right not to be arrested or to have one's property seized without probable cause were clearly established and widely known at the time of the events at issue here. *See, e.g., Dunaway v. New York*, 442 U.S. 200, 212 (1979) (reiterating the "general principle that Fourth Amendment seizures must be supported by the 'long-prevailing standards' of probable cause") (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)); *Virginia v. Moore*, 553 U.S. 164, 176-78 (2008) (holding that a warrantless arrest for a misdemeanor committed in the presence of a police officer, and a subsequent search incident to arrest, are lawful if there is probable cause to arrest); *Wong Sun v. United States*, 371 U.S. 471, 479 (1963) ("It is basic that an arrest . . . must stand upon firmer ground than mere suspicion . . . a relaxation of the fundamental requirements of probable cause would leave law-abiding citizens at the mercy of the officers' whim or caprice") (internal quotation marks omitted)). Officer Malouf's invocation of *Plumhoff v. Rickard*, 134 S. Ct. 2012 (2014) is unavailing. *Plumhoff* presented the question of whether it was clearly established that it was unconstitutional to use "lethal force to end a high-speed chase," *id.* at 2024, a factual scenario too far afield from the

facts here for that case to be enlightening. Officer Malouf is therefore not entitled to qualified immunity on Garcia's Fourth Amendment claims.[5]

Because the facts in the record, even when construed in the light most favorable to the defense, do not establish that Officer Malouf had probable cause to arrest Garcia for either hindering an arrest or second-degree assault, his motion for summary judgment on Garcia's Fourth Amendment claim is denied, and Garcia's motion for summary judgment as to those two crimes is granted. However, because there are factual disputes that must be resolved to determine whether Officer Malouf had probable cause to arrest Garcia for disorderly conduct, Garcia's motion for summary judgment as to his arrest for disorderly conduct is denied.

## V.      Common Law Claims

In addition to his constitutional claims, Garcia alleges three common law torts: (1) false arrest and false imprisonment (Count VI), (2) malicious prosecution (Count VII), and (3) battery (Count VIII). Officer Malouf seeks summary judgment on all three claims. Garcia seeks summary judgment on the false arrest and false imprisonment claim and the malicious prosecution claim.

The "necessary elements" of the tort of false arrest and false imprisonment are (1) the deprivation of the liberty of another; (2) without consent; and (3) without legal justification. *Ashton v. Brown*, 660 A.2d 447, 471 (Md. 1995). The elements of malicious prosecution are "(1) the defendant instituted a criminal proceeding against the plaintiff; (2) the criminal proceeding

---

[5]      Officer Malouf would still not be entitled to qualified immunity on Garcia's Fourth Amendment claim if the disorderly conduct arrest was based on the content of Garcia's complaints. *Diehl*, decided by the Maryland Court of Appeals in 1982, establishes that verbal protests against the police are speech protected by the First Amendment and therefore cannot serve as the basis for a disorderly conduct arrest unless they become exhortations to unlawful action. *Diehl*, 451 A.2d at 119. The First Amendment right not to be arrested for verbally protesting police action was thus a clearly established right at the time of the events in this case.

was resolved in the plaintiff's favor; (3) the defendant did not have probable cause to institute the proceeding; and (4) the defendant acted with malice or a primary purpose other than bringing the plaintiff to justice." *Okwa v. Harper*, 757 A.2d 118, 130 (Md. 2000). Battery consists of an intentional and unlawful touching, without consent, that is harmful or offensive. *Elias v. State*, 661 A.2d 702, 709 (Md. 1995).

Each side's argument on these three claims relies on its position on the Fourth Amendment arrest claim. Proceeding on the assumption that he had probable cause to arrest Garcia, Officer Malouf asserts that the arrest, detention, and prosecution of Garcia, and the physical contact necessary to effect the arrest, were all legal. Garcia, proceeding on the assumption that Officer Malouf did not have probable cause to arrest, argues that Officer Malouf necessarily unlawfully deprived Garcia of his liberty, initiated a criminal proceeding without probable cause, and also intentionally, unlawfully, and offensively touched Garcia.[6] Here, as discussed above, there is an unresolved factual question whether Officer Malouf had probable cause to arrest Garcia for disorderly conduct. With the lawfulness of Garcia's arrest unclear, there can be no determination as a matter of law on any of the common law claims.

Furthermore, on the malicious prosecution claim, even if Officer Malouf did not have probable cause to arrest, there would still be factual disputes that would preclude a determination on the fourth element: whether he acted with malice when arresting Garcia. "The 'malice' required for malicious prosecution consists of a wrongful or improper motive in initiating legal proceedings." *Alvarez v. Montgomery Co.*, 147 F.3d 354, 360 (4th Cir. 1998) (quoting

---

[6] Because the essence of battery is an unlawful touching, Officer Malouf's assertion that he used only the force necessary to effect the arrest does not resolve this claim. Battery includes any unlawful application of force, even one that results only in "slight" injury. *Elias*, 661 A.2d at 709.

*Montgomery Ward v. Wilson*, 664 A.2d 916, 924 (Md. 1995)).   Garcia asserts that Officer Malouf's wrongful motive was a desire to abridge his First Amendment rights.   Officer Malouf's alleged malice is thus bound up in the reasons behind, and the factual disputes surrounding, Garcia's arrest and thus cannot be resolved on summary judgment.

Finally, if the question of the legality of the arrest were resolved in Officer Malouf's favor, summary judgment on the battery claim would still be inappropriate.   Even if Officer Malouf was initially authorized to touch Garcia to effect a lawful arrest, Garcia asserts that Officer Malouf used more force than was necessary, including deliberately tripping him while he was handcuffed and pressing his neck in such a way as to cause significant pain.   Officer Malouf denies these allegations.   Thus, on this excessive force aspect of the battery claim, there are material factual disputes that preclude summary judgment.

For these reasons, the cross motions for summary judgment on the common law torts are both denied.

## VI.     The Privacy Protection Act

In Count V, Garcia asserts a claim under the Privacy Protection Act ("the PPA"), 42 U.S.C. § 2000aa *et seq.*, based on the alleged seizure of and failure to return the video card from his camera.   The PPA prohibits government officers "in connection with the investigation or prosecution of a criminal offense" from searching or seizing "any work product materials possessed by a person reasonably believed to have a purpose to disseminate to the public" those materials.   42 U.S.C. § 2000aa(a).   However, the "suspect exception" to the PPA allows government officials to seize otherwise exempt materials "if there is probable cause to believe that the person possessing such materials has committed or is committing the criminal offense to which the materials relate."   *Id.* at § 2000aa(a)(1).   Montgomery County seeks summary

judgment on Garcia's PPA claim, asserting that even assuming that Officer Malouf seized the video card, which he disputes, Garcia has failed to produce any evidence establishing that he had a "purpose to disseminate" his recording to the public, and arguing, in the alternative, that any seizure of the video card was permissible under the PPA suspect exception. Mot. Sum. J. at 40.

On the first argument, the County bases its contention that Garcia has not established that he had a "purpose to disseminate" the recording on the fact that none of the officers heard Garcia "express any such intentions" to distribute the material. *Id.* However, the PPA does not require an express statement of intent, only that it be reasonable to believe that the person possessing those materials has such an intention. *See* 42 U.S.C. 2000aa(a). Here, Garcia asserts, and the two Civilian Alcohol Enforcement team members confirmed, that Garcia audibly identified himself as a member of the press, a self-identification that would support the reasonable belief that Garcia intended to disseminate his recording to the public. *Cf. Teichberg v. Smith*, 734 F. Supp. 2d 744, 751-52 (D. Minn. 2010) (in considering whether the plaintiff intended to disseminate a recording to the public within the meaning of the PPA, noting that the plaintiff had not identified himself to officers as a journalist).

The County's claim that the video card could be seized pursuant to the PPA's suspect exception is also unpersuasive. The suspect exception applies only if there is probable cause to believe that the person possessing the materials committed a crime to which the materials relate. For the County to be shielded by this exception, there would have to be probable cause to believe that Garcia committed a crime and a further showing that his recording "relate[d]" to that crime within the meaning of the PPA. *See Sennett v. United States*, 667 F.3d 531, 535-37 (4th Cir. 2012) (affirming district court's application of the PPA suspect exception because there was probable cause to believe that plaintiff was involved in the vandalism that she had recorded).

Here, as discussed above, the only crime arguably committed by Garcia was disorderly conduct, and whether there was probable cause to believe that Garcia committed that offense, and whether the video recording related to that offense under the PPA, are open questions that cannot be resolved without a trial.  Thus, the County's motion for summary judgment on Count V is denied.

## CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment is GRANTED as to the claim for damages in Count I and the First Amendment retaliation claim against Officer Baxter in Count II.  The Motion is DENIED as to the claim for declaratory relief in Count I, the First Amendment retaliation claim against Officer Malouf in Count II, and all other counts at issue on the Motion.  Garcia's Cross Motion for Partial Summary Judgment is GRANTED on Count III as to the offenses of hindering an arrest and second-degree assault only.  Garcia's motion is DENIED in all other respects.  A separate Order follows.

Date:  November 5, 2015

THEODORE D. CHUANG
United States District Judge

49