MANNIE GARCIA,

     Plaintiff,

     v.

MONTGOMERY COUNTY, MARYLAND,
OFFICER CHRISTOPHER MALOUF, *in his
individual capacity*, and
OFFICER KEVIN BAXTER, *in his individual
capacity*,

     Defendants.

Civil Action No. TDC-12-3592

## MEMORANDUM OPINION

Presently pending is Plaintiff Mannie Garcia's Motion for Attorney's Fees and Costs. Having reviewed the briefs and submitted materials, the Court finds no hearing necessary. *See* D. Md. Local R. 105.6 (2016). For the reasons set forth below, Garcia's Motion is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

On December 7, 2012, Garcia filed suit against Defendants Montgomery County, Maryland; Montgomery County Police Department ("MCPD") Officers Kevin Baxter, Michael Graves, and Christopher Malouf; MCPD Chief Thomas Manger; and MCPD Lieutenant Mark Sheelor, alleging eight causes of action: (I) a claim under 42 U.S.C. § 1983 ("§ 1983") for a violation of his First and Fourteenth Amendment rights based on his allegation that on June 16, 2011, he was arrested for peacefully videorecording police activity; (II) a § 1983 claim for First Amendment retaliation stemming from incidents that occurred after he complained about his

arrest; (III) a § 1983 claim for a violation of his Fourth and Fourteenth Amendment rights based on the allegation that he was arrested and had his video card seized without probable cause; (IV) a § 1983 claim against Montgomery County only, pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), alleging a custom and practice of allowing MCPD officers to prevent recording of police activity, in violation of the First Amendment; (V) a claim under the Privacy Protection Act ("PPA"), 42 U.S.C. §§ 2000aa–2000aa-17 (2012), relating to the seizure of his video card; (VI) a common law false arrest and false imprisonment claim; (VII) a common law malicious prosecution claim; and (VIII) a common law battery claim against Officer Malouf only. All individual Defendants were sued in both their individual and official capacities, with the exception of Chief Manger and Officer Graves, who were sued in their official capacities only. Garcia sought money damages as well as injunctive and declaratory relief.

On August 23, 2013, the Court (Motz, J.) dismissed (1) all claims against Officer Graves and Lt. Sheelor; (2) all claims against Officer Baxter, except the First Amendment and retaliation claims; (3) the false arrest/false imprisonment and malicious prosecution claims against Montgomery County and Chief Manger; (4) the PPA claim against all defendants except Montgomery County; and (5) all claims against officers in their official capacity, except for Chief Manger.

On November 5, 2015, following discovery, the Court granted in part and denied in part the parties' cross motions for summary judgment. Specifically, the Court held that the First Amendment protected the peaceful videorecording of police officers in the performance of their duties and barred the seizure by the police of related recordings in order to prevent their dissemination. *Garcia v. Montgomery Cty.*, 145 F. Supp. 3d 492, 507–08, 510 (D. Md. 2015).

However, the Court further held that these rights were not clearly established in this jurisdiction at the time of the incident at the heart of this case, so Defendants Baxter and Malouf had qualified immunity from the damages claims asserted in Garcia's First Amendment claim in Count I. *Id.* at 509, 511. The Court thus granted summary judgment on Count I as to any claim for money damages, but not as to Garcia's claim for declaratory relief. *Id.* at 525. The Court also granted Officer Baxter summary judgment on the First Amendment retaliation claim. *Id.* at 515–16. On the Fourth Amendment claim in Count III, the Court granted summary judgment in favor of Garcia on the claims that he had been validly arrested for hindering an arrest and second-degree assault, but denied it on the claim that he was validly arrested for disorderly conduct. *Id.* at 519–21. The Court denied summary judgment on the remaining claims.

On June 23, 2016, the parties stipulated to the dismissal of all claims against Chief Manger and all claims against Montgomery County with the exception of the PPA claim. In August 2016, the Court scheduled a trial on the remaining claims, which consisted of: (1) Count I: the § 1983 First Amendment claim for a declaratory judgment against Officers Malouf and Baxter in their individual capacities; (2) Count II: the § 1983 First Amendment retaliation claim against Officer Malouf in his individual capacity; (3) Count III: the § 1983 Fourth Amendment claim against Officer Malouf in his individual capacity; (4) Count V: the PPA claim against Montgomery County; (5) Count VI: the false arrest and false imprisonment claim against Officer Malouf in his individual capacity; (6) Count VII: the malicious prosecution claim against Officer Malouf in his individual capacity; and (7) Count VIII: the battery claim against Officer Malouf in his individual capacity.

In September 2016, Garcia propounded a settlement demand seeking an apology from MCPD, financial compensation, attorney's fees, and training of MCPD officers on media

relations. On January 13, 2017, the parties proceeded to mediation before a United States Magistrate Judge. At the start of the mediation, Defendants presented Garcia with MCPD Training Bulletin # 17-01, adopted one day earlier, the purpose of which was "to emphasize and clarify current law and the policy of the Montgomery County Police Department when dealing with citizens who are using a camera, cellphone or other recording devices to film/video tape the police during the performance of their duties." Training Bulletin at 1, Mot. Atty. Fees Ex. 9, ECF No. 98-2. That Bulletin announced that "[a] citizen or member of the media may not be arrested solely because that citizen is filming the police," because "the United States District Court for the District of Maryland recently held that '…video recording of police activity, if done peacefully and without interfering with the performance of police duties, is protected by the First Amendment.'" *Id.* The Bulletin further instructed that "Officers are prohibited from threatening, intimidating, or otherwise discouraging any individual from recording police activities," and that "[t]he mere fact that the citizen was video recording the officer's conduct IS NOT an element in determining probable cause" to arrest for a different offense. *Id.* at 1-2. According to Garcia, once he had approved the contents of the Training Bulletin, the settlement negotiations turned to money damages, with Defendants ultimately agreeing to pay him $45,000.

On January 27, 2017, the parties notified the Court that they had negotiated a settlement in principle, asked to be removed from the trial calendar, and informed the Court that a stipulation of dismissal would soon be filed. By February 23, 2017, no such stipulation had been filed, so the Court convened a status conference at which the parties explained that they continued to disagree on whether the issuance of the Training Bulletin was part of the settlement agreement. After a follow-up session with the Magistrate Judge, the parties agreed to reference the Training Bulletin in the settlement agreement. On March 3, 2017, the parties filed a

Stipulation of Dismissal with a proposed Order for the Court. The Stipulation provided that Garcia could petition for attorney's fees and that:

> Defendants will raise defenses in opposing any such request, including but not limited to Defendant[s'] assertion that Plaintiff did not prevail on such claims, except that the parties agree, solely for the purpose of the Fee Petition, to treat Plaintiff as if he prevailed on fee shifting claims the Court left for trial by the jury, and for which qualified immunity from damages was not granted.

Stipulation of Dismissal with Prejudice ("Stipulation") at 1, ECF No. 96. On March 6, 2017, the Court issued an Order dismissing the case. Garcia then filed his Motion for Attorney's Fees and Costs.

## DISCUSSION

Garcia initially sought attorney's fees in the amount of $718,703.00 for 1,124.5 hours of work and costs in the amount of $12,402.34. Garcia later consented to exclude 7.7 billed hours on his voluntarily dismissed *Monell* claim, reducing the billed hours to 1,116.8 and the requested fee award to $712,889.50. Defendants assert that Garcia is not a prevailing party entitled to attorney's fees, or, in the alternative, that the requested attorney's fees are vastly disproportionate to Garcia's success; that Garcia's attorneys have billed their time at rates far exceeding what is customary in this District; and that the number of billed hours exceeds what is reasonable.

## I.     Prevailing Party

Under 42 U.S.C. § 1988 ("§ 1988"), in any action to enforce § 1983, "the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b). Before awarding fees, a court must therefore make a threshold determination whether a plaintiff is a prevailing party. "[P]laintiffs may be considered 'prevailing parties' for attorneys' fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Hensley v. Eckerhart*, 461 U.S. 424, 433

(1983). In *Farrar v. Hobby*, 506 U.S. 103 (1992), the United States Supreme Court held that fees could be awarded when a plaintiff "obtain[s] an enforceable judgment against the defendant from whom fees are sought, or comparable relief through a consent decree or settlement." *Id.* at 111 (internal citations omitted). More recently, the Supreme Court was presented with the question whether a plaintiff could be considered a prevailing party under a "catalyst theory," a term designating instances where a lawsuit prompted a "defendant's voluntary change in conduct," but produced no binding resolution. *Buckhannon Bd. v. W. Va. Dep't of Health and Human Res.*, 532 U.S. 598, 602, 605 (2001). In rejecting the catalyst theory as a basis to award attorney's fees, the Supreme Court stated that in order to be deemed a prevailing party under § 1988, a plaintiff must have secured a "judicially sanctioned change in the legal relationship of the parties." *Id.* at 605. By way of illustration, the *Buckhannon* Court stated that "judgments on the merits" and "settlement agreements enforced through a consent decree may serve as the basis for an award of attorney's fees." *Id.* at 604. Noting that "[n]ever had we awarded attorney's fees for a nonjudicial 'alteration of actual circumstances,'" the Court established a requirement that there be a "judicial *imprimatur*" on the change in order for it to confer prevailing party status. *Id.* at 605-06; *Grissom v. The Mills Corp.*, 549 F.3d 313, 318 (4th Cir. 2008).

Although *Buckhannon* decided only the issue of the viability of the catalyst theory for establishing prevailing party status, it arguably could be read to narrow *Farrar* by excluding settlements unaccompanied by consent decrees from the forms of case resolution warranting prevailing party status. The Court need not decide that issue. Here, the parties have entered into a settlement agreement that does not include a consent order and, in fact, has never been presented to the Court. Ordinarily, in a settlement agreement without a consent order, the issue of attorney's fees is resolved through a negotiated agreement so that prevailing party status does

not matter. *See Buckhannon*, 532 U.S. at 609 (noting that a defendant "has a strong incentive to enter a settlement agreement where it can negotiate attorney's fees and costs"). In this case, the parties have stipulated as part of their settlement not to the amount of attorney's fees, but "to treat Plaintiff as if he prevailed on fee shifting claims the Court left for trial by the jury, and for which qualified immunity from damages was not granted." Stipulation at 1. Defendants have therefore already conceded the point that the Court must treat Garcia as a prevailing party and thus may award attorney's fees. The scope of Garcia's success, and the amount of attorney's fees that should reasonably be awarded, is addressed at later stages of the review process. *See Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 793 (1989) (emphasizing that "the degree of the plaintiff's overall success goes to the reasonableness of the award under *Hensley,* not to the availability of a fee award *vel non*"); *Farrar*, 506 U.S. at 114 (stating that "the 'technical' nature of a nominal damages award … does not affect the prevailing party inquiry," but does "bear on the propriety of fees awarded under § 1988").

Nevertheless, in order properly to assess the remaining issues on the Motion, the Court considers on which claims Garcia is deemed to have prevailed. To do so, the Court must interpret the language of the Stipulation, the vehicle by which prevailing party status is conferred in this case. Rather than simply identifying the specific counts on which the parties agreed that Garcia should be deemed to have prevailed, the parties agreed opaquely "to treat Plaintiff as if he prevailed on fee shifting claims the Court left for trial by the jury, and for which qualified immunity from damages was not granted." Stipulation at 1. This language undisputedly includes the First Amendment retaliation claim in Count III against Officer Malouf, the Fourth Amendment claim in Count V against Officer Malouf, and the PPA claim in Count VI against Montgomery County, but the parties disagree on whether it includes the First Amendment claim

in Count I.  Defendants argue that because the Court granted qualified immunity on damages to Officer Malouf and Officer Baxter on the First Amendment claim, Garcia did not prevail on any aspect of Count I.  Garcia, however, argues that Count I included a First Amendment claim for a declaratory judgment on which no qualified immunity was granted, such that the parties agreed that he prevailed on that claim.

Where the Stipulation does not contain more explicit language on whether Garcia prevailed on Count I, the Court is left to interpret the parties' agreed-upon language.  The Court finds the language ambiguous in that it could be read to include or exclude the First Amendment declaratory judgment claim from those claims on which Garcia prevailed, depending on whether the First Amendment claims for money damages and declaratory relief could be fairly separated from each other.  *See Pacific Indem. Co. v. Interstate Fire & Cas. Co.*, 488 A.2d 486, 489 (Md. 1985) ("If the language of the contract is ambiguous, extrinsic evidence may be consulted to determine the intention of the parties.").  Although not a model of clarity, the language is most fairly read, in context, to include an agreement that Garcia prevailed on the First Amendment claim for declaratory relief.  First, in ruling on the Cross Motions for Summary Judgment, the Court denied summary judgment on this claim such that it was a fee-shifting claim "left for trial by the jury" along with the remaining claims for damages.  *See Beacon Theaters, Inc. v. Westover*, 359 U.S. 550, 508-09 (1959) (noting that where an action for a declaratory judgment is brought together with an action for damages, the Federal Rules of Civil Procedure and the Declaratory Judgment Act allow them to be resolved together in a jury trial); 9 C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2313 (3d ed. 2013) (stating that "[i]f there would have been a right to jury trial on the issue if it had arisen in an action other than one for a declaratory judgment, it must be tried to a jury in the declaratory action").  Indeed, the Court

specifically stated in its opinion on summary judgment that a ruling on the First Amendment declaratory judgment claim "would require a trier of fact to sift through and weigh these opposing factual accounts." *Garcia*, 145 F. Supp. 3d at 513. Moreover, although Garcia pleaded a single First Amendment count seeking damages, a declaratory judgment, and injunctive relief, the Court explicitly treated the damages claim and the declaratory judgment claim separately on the issue of whether it would proceed to trial. With this backdrop, the most reasonable interpretation of the Stipulation is that it recognized these two claims to be separate, and that the parties thus agreed that Garcia had prevailed on the declaratory judgment claim but not on the damages claim of his First Amendment cause of action, just as had occurred on the summary judgment motions. Had the parties agreed that all First Amendment claims were to be treated together, there would have been no need for qualifying language referring to claims "for which qualified immunity from damages was not granted." Stipulation at 1.

This interpretation is consistent with the principle that a grant of qualified immunity from damages would not necessarily preclude a plaintiff from prevailing on a First Amendment claim such that attorney's fees would be due. *See Lefemine v. Wideman*, 758 F.3d 551, 555 (4th Cir. 2014). In *Lefemine*, the United States Court of Appeals for the Fourth Circuit stated that § 1988 was enacted in part to allow for attorney's fees in cases where money damages are unavailable due to immunity, because "awarding counsel fees to prevailing plaintiffs in such litigation is particularly important and necessary if [f]ederal civil and constitutional rights are to be adequately protected." *Id.* (quoting H.R. Rep. No. 94-1558, at 9 (1976)).

It is also consistent with the relief that arose from the settlement agreement. Here, one of the key forms of relief Garcia sought was training of MCPD officers on the First Amendment rights of journalists and citizens. The settlement agreement specifically referenced MCPD's

adoption of a Training Bulletin on that very topic. The fact that the primary message in the Training Bulletin was that this Court had ruled, in this very case, that the First Amendment protected videotaping by citizens of police activity, is consistent with the interpretation that the parties agreed that Garcia prevailed on the First Amendment declaratory judgment claim, as the Training Bulletin, though not a formal declaratory judgment on the constitutionality of MCPD's treatment of Garcia, provided a public acknowledgment that the law barred the type of treatment he alleged he received from Defendants.

Accordingly, the Court concludes that pursuant to the Stipulation, Garcia is deemed to have been the prevailing party on the First Amendment declaratory judgment claim, the First Amendment retaliation claim against Officer Malouf, the Fourth Amendment claim against Officer Malouf, and the PPA claim against Montgomery County.

## II.    Calculation of Fees

Having determined that Garcia is a prevailing party in this action, the Court turns to calculating what, if any, attorney's fees are reasonable. This inquiry is a three-step process: (1) the court must determine the lodestar figure by multiplying the number of reasonable hours expended by a reasonable rate for those hours; (2) the court must subtract fees for hours spent on unsuccessful claims unrelated to successful ones; and (3) the court should adjust the award as necessary by awarding some percentage of the remaining amount, depending on the degree of success achieved by the plaintiff. *McAfee v. Boczar*, 738 F.3d 81, 88 (4th Cir. 2013). Throughout this process, the Court should apply the factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974), while taking care not to double count any factor. *McAfee*, 738 F.3d at 89-90. The *Johnson* factors are: "(1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly

10

perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases." *Id.* at 88 n.5. "[T]he burden rests with the fee applicant to establish the reasonableness of a requested rate." *Id.* at 91 (*quoting Plyler v. Evatt,* 902 F.2d 273, 277 (4th Cir.1990)).

### A.    Lodestar Figure

#### 1.    Reasonable Hours

Garcia seeks fees for 1,116.8 hours of work. Voluntarily excluded from that time are hours his counsel spent preparing two unsuccessful discovery motions and "all *Monell* discovery fees and costs, and related work." Mot. Atty. Fees at 11, ECF No. 98-1. Defendants take issue with every other aspect of the billed hours.

First, Defendants assert that Garcia's counsel overbilled for a preliminary demand letter and the Complaint because the Complaint largely duplicated the facts set forth in the demand letter and because another Complaint, drafted by a different attorney, had previously been filed. The operative Complaint in this case was 24 pages long, contained extensive factual detail, and ultimately provided a sturdy case architecture, as evidenced by the fact that there were no subsequent amendments. It was significantly more detailed than the first filing, and present counsel presumably had to learn and verify for themselves all of the facts underlying the Complaint, as well as research the underlying law, so it is not reasonable to assume that they

could simply recycle the original filing. From the billing records, the Court finds that the total of approximately 20.4 hours of time on the demand letter, which included legal research time, and 32.4 hours of time on the Complaint, was reasonable. *See Corral v. Montgomery Cty.*, 91 F. Supp. 3d 702, 716–17 (D. Md. 2015) (finding that 25 hours was reasonable for preparation of a two-count complaint pleading a § 1983 First Amendment claim and a § 1983 Fourteenth Amendment due process claim because "oftentimes the success of a First Amendment case rises or falls on the details").

Defendants next assert that there are various instances of administrative tasks that were unnecessarily or double billed. Because Garcia's counsel, as discussed below, emphasize their legal sophistication and thus seek concomitantly high fees, the Court agrees that any billing for administrative tasks results in an inappropriately high cost for basic work. *See Spell v. McDaniel*, 824 F.2d 1380, 1401–02 & n.17 (4th Cir. 1987) (upholding the district court's general reduction of hours to account for time spent by counsel on "non-legal" or duplicative tasks even though "in some circumstances, it may be more efficient and reasonable for counsel to perform such tasks"). Likewise, where Garcia's legal team included three attorneys, duplicative billing should not be included in the fee calculation. *See id.* Here, Garcia's counsel voluntarily removed various billing entries relating to administrative tasks such as transmitting documents and largely excluded duplicative hours among the three counsel. Nevertheless, upon careful review of the billing records, the Court disallows 2.0 hours from attorney Ronald London and 6.5 hours from attorney Alison Schary as duplicative charges that would not be reasonable to include in an attorney's fee award.

Defendants also assert that both deposition preparation and depositions themselves were overstaffed and thus overbilled. Defendants cite no authority for the proposition that only one

attorney may be involved in deposition preparation, and the Court sees no compelling reason that such a key part of civil litigation must be an entirely solitary undertaking. *See Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 180 (4th Cir. 1994) (noting "the need to avoid use of multiple counsel for tasks where such use is not justified by the contributions of each attorney," but nevertheless determining that there was "no evidence" that the attorneys in that case "in any sense applied an unreasonable effort to the task"). Although Defendants are correct that "in seeking attorney's fees under section 1988, attorneys are under a duty to minimize expenses," and parties are limited to "one qualified attorney where the issues are simple," *Trimper v. City of Norfolk, Va.*, 58 F.3d 68, 76 (4th Cir. 1995), this First Amendment case was at a level of complexity that would justify more than one attorney working on deposition preparation. Indeed, to the extent that some tasks were handled by an attorney at a lower billing rate, the participation of multiple attorneys could be cost-effective.

As for instances where Garcia had multiple attorneys attend a deposition, the Local Rules of this District dictate that in fee-shifting cases, only one attorney for the plaintiff may be compensated for attending a deposition. *See* D. Md. Local R. App'x B 2(b). The Rule allows for an exception where "more than one retained attorney attended the deposition and charged the time for his/her attendance." *Id.* (footnote). Although the Rule does not explain why the exception applies only to retained counsel charging time, the rationale appears to be that when a defendant is willing to pay two attorneys to attend, the defendant has effectively acknowledged that the matter is of sufficient complexity to warrant such resources. Although arguably the presence of two government attorneys may signal the same, the plain language of the Rule does not permit its application based on the presence of two government attorneys.

Here, although Garcia's counsel has clarified that they have billed deposition hours for two attorneys only when Defendants also had two attorneys in attendance, those attorneys were County staff attorneys who were not retained and did not charge for their time. Although some of the depositions involved issues of sufficient complexity that a second attorney might be warranted, the Rule does not allow for such an exception. The Court will therefore limit the reasonable hours for deposition attendance to the hours of the attorney who conducted the deposition, resulting in a reduction of 40.9 hours for London and 3.3 hours for Schary.

Defendants lastly claim that the billed hours for motions practice were excessive, particularly considering what they characterize as Garcia's lack of success. Because *McAfee* instructs courts to make reductions for unsuccessful claims after the lodestar has been calculated, the Court addresses the results of the motions practice separately and looks now only to the reasonableness of the time spent on it. *McAfee*, 738 F.3d at 88. Garcia's three attorneys billed 118.7 hours over a one-month response period, the equivalent of approximately three weeks of work for single attorney, opposing Defendants' Motion to Dismiss with a 42-page brief. In the Motion to Dismiss, Defendants argued that the individual Defendants had qualified immunity, sought dismissal of at least some aspect of seven of Garcia's eight claims, sought dismissal of all official capacity claims, and, alternatively, sought bifurcation of the *Monell* claim. Considering the numerous, non-exclusive arguments for dismissal raised by Defendants, the Court concludes that 118.7 hours spent in opposing the Motion is not excessive. *See Rum Creek*, 31 F.3d at 180 (citing that "the litigation was vigorously contested" by the defendants as a reason for "the hours necessary to prosecute" the case).

For much the same reason, the Court finds reasonable the hours billed on the Cross Motions for Summary Judgment, consisting of two briefs: Garcia's combined Memorandum in

Opposition to Defendants' Motion for Summary Judgment and in Support of Garcia's Motion for Partial Summary Judgment, and Garcia's Reply Memorandum on his Motion for Partial Summary Judgment. The record on summary judgment was voluminous, consisting of over 50 exhibits and over 1,000 pages. Defendants sought summary judgment on each of Garcia's remaining claims and also asserted that the individual defendants had qualified immunity on the First Amendment claim. The qualified immunity analysis on the First Amendment claim addressed an area of important but uncertain and unsettled law, as evidenced by the Statement of Interest filed by the United States Department of Justice. Garcia's counsel spent a total of 214.4 hours across three attorneys over a one-month period, consisting of approximately one and a half weeks of work for each attorney, and a total of 120.4 hours on the reply brief over a one-month period, consisting of approximately one week of work for each attorney. Considering the scope of the issues raised on summary judgment as well as their novelty and complexity, the Court finds the billed hours reasonable. *See Rum Creek*, 31 F.3d at 180 (noting that "the difficulty and complexity" of a case "tend[s] to justify full compensation," particularly when the case is "vigorously contested").

The Court finds the modest 12.8 hours billed for all other motions to be reasonable. The Court also finds the 41.8 hours billed for the fee petition to be reasonable considering the length of the case, which settled just short of trial, and the fact that Defendants have contested nearly all aspects of Garcia's fee petition, including Garcia's status as a prevailing party. *Cf. Daly v. Hill*, 790 F.2d 1071, 1080 (4th Cir. 1986) (determining that the district court had not abused its discretion in finding 37.9 hours billed for a fee petition to be unreasonable in part because "there was no dispute as to the attorney's entitlement to fees").

Having examined the remaining hours expended on the case to which Defendants raise no objection, the Court finds them to be reasonable. The Court thus calculates the total reasonable hours expended on this litigation to be 1,064.1. In reaching this calculation, the Court addressed the first three *Johnson* factors: (1) the time and labor expended, (2) the novelty and difficulty of the questions raised, and (3) the skill required to properly perform the legal services rendered. *See McAfee,* 738 F.3d at 88 n.5.

### 2. Reasonable Rates

In this case, Garcia was represented by three attorneys: Robert Corn-Revere, Ronald London, and Alison Schary. His case was staffed by one paralegal. Corn-Revere asserts that these attorneys' standard billing rates to paying clients are as follows: Corn-Revere seeks $755 per hour; London seeks $620 per hour; Schary seeks $515 per hour. The paralegal is billed at $340 per hour. Garcia provides affidavits from two other attorneys, Charles D. Tobin and Jeffrey L. Light, attesting that the requested rates are reasonable for equivalently experienced First Amendment litigators in the Washington D.C. area.

To establish that a particular billing rate is reasonable, a fee petitioner "must produce specific evidence of the prevailing market rates in the relevant community for the type of work for which he seeks an award." *Spell,* 824 F.2d at 1402. Garcia's counsel asserts that the proposed billing rates are in line with the rates in the "Washington D.C. metropolitan area," Mot. Atty. Fees at 20, but this claim is based on the assumption that rates in Washington, D.C. are the same as those in the surrounding communities such as Montgomery County, Maryland. Although Montgomery County, where the events in this case occurred, is adjacent to Washington, D.C., that geographic proximity is not enough to establish that Washington D.C. is the relevant community. Indeed, the Fourth Circuit upheld the conclusion of the United States

District Court for the Eastern District of Virginia that evidence of prevailing rates in Washington D.C. had not been shown to be a "reliable indicator of the hourly rates of litigation attorneys" in Reston, Virginia, a suburb of Washington, D.C. *See Grissom*, 549 F.3d at 323. Because this case centered on Montgomery County, both as a defendant and as the location of the events at issue, the Court determines that Montgomery County, not Washington, D.C., is the relevant community.

Garcia asserts that regardless of the relevant community, Corn-Revere has specialized expertise in First Amendment litigation that justifies his higher billing rate. "Rates charged by attorneys in other cities ... may be considered when the complexity and specialized nature of a case ... mean that no attorney, with the required skills, is available locally." *Rum Creek*, 31 F.3d at 179. Garcia offers an example of New York and Washington, D.C. hourly rates used in a fee award in a South Carolina First Amendment case. Garcia, however, has provided no basis to support the conclusion that no Maryland-based counsel was qualified and available to litigate his claims in this case. Although First Amendment law is a specialized field, the legal and factual issues in this case were not so complex that only a select few attorneys with high billing rates could have successfully advanced Garcia's case. The Court therefore does not accept Garcia's proposed billing rates or his alternative suggestion to determine the reasonable rates with reference to the Laffey Matrix, a billing guideline for Washington, D.C. attorneys. *See Grissom*, 549 F.3d at 323 (rejecting the Laffey Matrix as a reasonable rate for the Washington, D.C. suburb of Reston, Virginia); *Robinson v. Equifax Info Servs., LLC*, 560 F.3d 235, 245 (4th Cir. 2009) (noting that the district court had "properly recognized that the Laffey Matrix is not binding upon the United States District Court for the Eastern District of Virginia" and was not, by itself, a "reliable indicator of the hourly rates of litigation attorneys in Alexandria, Virginia, a

suburb of Washington D.C.") (quoting *Grissom*, 549 F.3d at 323); *Nat'l Elec. Benefit Fund v. Mirarchi Bros., Inc.*, No. DKC-11-2621, 2013 WL 2637524 at *4 (D. Md. June 11, 2013) (finding that "the Laffey Matrix is not binding upon the United States District Court for the District of Maryland" and the plaintiff had not shown that it was a "reliable indicator of the hourly rates of attorneys in [southern Maryland], a suburb of Washington, D.C.") (quoting *Robinson*, 560 F.3d at 245); *Life Tech. Corp. v. Life Tech Corp.*, No. RWT-10-3527, 2012 WL 4748080 at *2 (D. Md. Oct. 2, 2012) (emphasizing that the Fourth Circuit and this District have repeatedly held that the Laffey Matrix is not "sufficient evidence of the prevailing market rate in this jurisdiction or other areas bordering the District of Columbia, which tends to have higher prevailing rates") (citation omitted). The Court instead relies on the guidelines for attorney's fees set by this Court in its Local Rules. *See* D. Md. Local. R. App'x B: Guideline 3. In doing so, the Court applies the *Johnson* factors of the customary fee for like work and attorney's fees awards in comparable cases. *See McAfee,* 738 F.3d at 88 n.5.

In identifying the specific rate, the Court considers the following *Johnson* factors: (1) the attorney's opportunity costs in pressing the instant litigation; (2) the attorney's expectations at the outset of the litigation; (3) the time limitations imposed by the client or circumstances; (4) the experience, reputation, and ability of the attorney; (5) the undesirability of the case within the legal community in which the suit arose; and (6) the nature and length of the professional relationship between attorney and client. *See id.* No facts have been presented that the client imposed any time limitations, or that the nature of any prior relationship between the attorneys and the client had any particular impact on the appropriate billing rates.

Corn-Revere has been a member of the bar since 1983 and has extensive experience litigating constitutional law claims, particularly First Amendment claims. For an attorney

admitted to the bar for 20 or more years, this Court's Guidelines Regarding Hourly Rates provide for an hourly billing range of $300–$475. In light of Corn-Revere's 35 years of experience and reputation in the field of First Amendment law, as well as his standard billing rate which reflects the opportunity cost of this case and his expectations at the outset, the Court finds that his hours should be billed at the highest rate of $475 per hour.

Ronald London has been practicing law since 1995 and also has extensive experience in First Amendment litigation. London, with 22-23 years of experience, is at the lower end of the range of attorneys with 20 or more years of experience and thus would ordinarily be granted a billing rate close to $300. Because of his experience in the field of First Amendment law, as well as his standard billing rate which reflects the opportunity cost of this case and his expectations at the outset, the Court finds that a higher rate is appropriate. An additional consideration is that a lawsuit against a police department and police officers may be viewed by some in the community as an undesirable case. Considering all of these factors, the Court finds that London's hours should be billed at $425 per hour.

Alison Schary has been practicing law since 2009 and has begun building a practice in First Amendment litigation. For an attorney admitted to the bar for 9 to 14 years, this Court's Guidelines Regarding Hourly Rates provide for an hourly billing range of $225–$350. Although Schary's experience is at the low end of this range, which would typically warrant a $225 per hour rate, the Court considers Schary's standard billing rate which reflects the opportunity cost of this case and her expectations at the outset, as well as the potential undesirability of the case, and finds that Schary's hours should be billed at a rate of $300 per hour.

The paralegal assigned to this case has over 30 years of experience in litigation. This Court's Guidelines Regarding Hourly Rates provide for an hourly billing range of $95–$150 for

paralegals and law clerks. In light of the extent of the paralegal's experience, the Court finds that her hours should be billed at a rate of $150 per hour.

The Court thus computes the lodestar as follows:

| Personnel | Reasonable Hours | Reasonable Rate | Lodestar |
|---|---|---|---|
| Corn-Revere | 402.1 | $475 | $190,997.50 |
| London | 433.3 | $425 | $184,152.50 |
| Schary | 178.6 | $300 | $53,580.00 |
| Paralegal | 50.1 | $150 | $7,515.00 |
| TOTAL | 1,064.1 | | $436,245.00 |

### B. Successful and Unsuccessful Claims

Once a court has determined the reasonable hours and the reasonable rate, it is "obliged to subtract fees for hours spent on unsuccessful claims unrelated to the successful ones." *McAfee,* 738 F.3d at 91 (citation omitted). A plaintiff's claim is unrelated if it is "based on different facts and legal theories." *Hensley*, 461 U.S. at 434. Such claims are distinguished from related claims as follows:

> When the plaintiff has failed to prevail on a claim that is *distinct in all respects from his successful claims*, the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee. Where a lawsuit consists of *related* claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised.

*Id.* at 440 (emphasis added).

Here, Defendants correctly note that Garcia had mixed success on his claims. For example, the Court dismissed all of Garcia's claims against officers in their official capacity and all claims against Lt. Sheelor, it granted summary judgment against Garcia on his First Amendment damages claims against Officers Baxter and Malouf based on qualified immunity and on his First Amendment retaliation claim against Officer Baxter, and Garcia voluntarily dismissed his *Monell* claim and the claims against Chief Manger. Garcia has conceded that the

*Monell* claim was unsuccessful and sufficiently unrelated such that he has excluded attorney's fees for that claim from the fee petition. *See McAfee*, 738 F.3d at 92 (upholding reduction for work on an unsuccessful claim where the hours worked on that claim could be identified and deducted on a line-by-line basis).

The other claims on which Garcia was not ultimately successful were closely related to claims on which he was the prevailing party. As discussed above, the Stipulation of Dismissal expressly states that, for purposes of the fee petition, the parties agreed to treat Garcia as the prevailing party for all fee-shifting claims "the Court left for a trial by the jury, and for which qualified immunity from damages was not granted." Stipulation at 1. Even under the most narrow reading advocated by Defendants, the parties agreed that Garcia prevailed on his Fourth Amendment and First Amendment retaliation claims against Officer Malouf, and his PPA claim against Montgomery County, as all are fee-shifting claims that were slated for trial and for which this Court granted no qualified immunity. *Garcia*, 145 F. Supp. 3d at 513–16, 522–23. Those claims cover the full relevant factual universe of this case. The entire encounter between Garcia and MCPD officers on June 16, 2011 was relevant to the Fourth Amendment claim against Officer Malouf, and the later MCPD police activities outside Garcia's residence were relevant to the First Amendment retaliation claim against Officer Malouf. The unsuccessful claims, including the First Amendment damages claims, the state law claims, and claims dismissed against specific officers, all arise from the same set of facts. Thus, the unsuccessful claims are not "distinct in all respects" from the successful claims, but are instead "related" to those claims. *Hensley*, 461 U.S. at 440.

This conclusion is reinforced by the Court's determination, as discussed above, that Garcia was a prevailing party on the First Amendment declaratory judgment claim. *See supra*

part I. This claim, too, arises from the same facts as the Fourth Amendment claim: the entire encounter between Garcia and MCPD officers on June 16, 2011. Accordingly, the First Amendment declaratory judgment claim provides another basis by which to conclude that the unsuccessful claims were related to the successful claims based on their common set of facts.

Because of their overlapping facts and legal theories, any parsing of successful from unsuccessful claims for purposes of billing would be a difficult and fraught enterprise. *See City of Riverside v. Rivera*, 477 U.S. 561, 570–73 (1986) (holding that the district court correctly declined to parse unsuccessful claims from successful ones because "[t]he time devoted to claims on which plaintiffs did not prevail cannot reasonably be separated from time devoted to claims on which plaintiffs did prevail"). Indeed, in *Abshire v. Walls*, 830 F.2d 1277 (4th Cir. 1987), the Fourth Circuit held that the district court had erred in reducing billable hours for unsuccessful claims for false arrest, false imprisonment, and malicious prosecution where those claims and a successful § 1983 claim for an unconstitutional strip search "arose from a common core of facts." *Id.* at 1282–83 (citing *Hensley*).

Here, as in *Abshire*, the facts surrounding the First Amendment, Fourth Amendment, PPA, and state law claims were "inextricably intertwined" such that "it is impossible to isolate the inquiry" into discrete claims. *Id.* at 1283. For example, all of the depositions were of witnesses who could not be deemed to have been relevant to an unsuccessful claim only. Questions about Garcia's interactions with the police on June 16, 2011, and about the subsequent presence of police officers near Garcia's residence, related directly to both successful and unsuccessful claims. The main legal filings, the motion to dismiss and the cross motions for summary judgment, addressed these common facts and legal arguments relating to both successful and unsuccessful claims. Because the Court concludes that the successful and

unsuccessful claims were related, it will not attempt to calculate a reduction in the attorney's fee award based on the work isolated to unsuccessful claims. *See Cooper v. Dyke*, 814 F.2d 941, 950 (4th Cir. 1987) ("[W]here all claims are closely related because based on common facts or related legal theories, a court is not obligated to determine which hours were spent on which claims. A contrary rule would be unworkable and would discourage innovative litigation.") (citing *City of Riverside*, 477 U.S. at 570–73).

To the extent that the lack of success on related claims should affect the attorney's fee award, it is addressed in the next step of the analysis, degree of success. *See Hensley*, 461 U.S. at 440 ("But where the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained.").

## C.     Degree of Success

Lastly, the Court must "consider the extent of success" when settling on a fee award. *Hensley*, 461 U.S. at 439. Under this factor, if a plaintiff obtains "excellent results," the attorney should receive a fully compensatory fee, even if "the plaintiff failed to prevail on every contention raised in the lawsuit," because it is appropriate for litigants to assert good faith, alternative legal grounds for the same desired outcome. *Id.* at 435. On the other hand, if there is only "partial or limited success," a fully compensatory fee may be "an excessive amount." *Id.* at 436. A victory that does little more than provide "the moral satisfaction of knowing that [one's] rights had been violated," would justify only a modest fee award. *Farrar*, 506 U.S. at 114. The central question of this inquiry is whether "the plaintiff achieve[d] a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award." *Hensley*, 461 U.S. at 434.

Notably, the Supreme Court has expressly "reject[ed] the proposition that fee awards under § 1988 should necessarily be proportionate to the amount of damages a civil plaintiff actually recovers." *City of Riverside*, 477 U.S. at 574. Instead, courts must be mindful that civil rights actions are "more than a private tort suit benefiting only the individual plaintiffs whose rights were violated." *Id.* A successful plaintiff "often secures important social benefits that are not reflected in nominal or relatively small damages awards," but which warrant the awarding of fees. *Id.*

Based on these principles, the Court declines to adopt Defendants' proposed measures of the success or lack of success in this case. Defendants assert that Garcia was unsuccessful on the "vast majority" of his claims because claims against four Defendants were dismissed entirely, and individual claims against specific remaining Defendants were also dismissed, such that, they assert, over 40 claims against specific Defendants were dismissed. Opp'n Mot. Atty. Fees at 26, ECF No. 101. This mode of accounting, however, ignores the fact that after summary judgment, seven of the eight causes of action remained intact against at least one Defendant, and that lack of success on asserted alternative grounds do not necessarily undermine overall success. *See Hensley*, 461 U.S. at 435 & n.11 (agreeing with the district court's rejection of a "mathematical approach comparing the total number of issues in the case with those actually prevailed upon").

Likewise, Defendants' contention that Garcia's $45,000 monetary recovery should be measured against the $500,000 in compensatory damages and $500,000 in punitive damages pleaded in the first Complaint filed by predecessor counsel is unpersuasive. Among other considerations, the Court is required to "compare the amount of damages sought to the amount awarded." *McAfee*, 738 F.3d at 93. However, beyond the fact that present counsel should not be bound by a filing made by unrelated counsel, the success of this case hinges much more on the

24

public benefits relating to vindication of constitutional rights rather than the specific amount received by Garcia. *See City of Riverside*, 477 U.S. at 574. Likewise, the more limited comparison of the $45,000 settlement payment to the approximately $130,000 in damages identified by Garcia in discovery, though relevant, is not dispositive.

Nevertheless, the Court agrees with Defendants that Garcia did not achieve total success. Garcia sought the following relief in his Complaint: (1) a declaratory judgment that his constitutional rights were violated based on his arrest; (2) a declaratory judgment that his constitutional rights were violated by the seizure of his camera and video card; (3) unspecified compensatory damages; (4) unspecified actual damages; (5) unspecified punitive damages; and (6) injunctive relief barring MCPD from arresting individuals exercising their First Amendment right to record police activity and requiring MCPD to implement a policy to train officers on those First Amendment rights. Through these claims, he sought to hold Montgomery County and five officers accountable, including through damages awards against the individual officers.

After the settlement, Garcia received the $45,000 payment, secured a federal court ruling that peaceful videorecording of police activity is protected by the First Amendment, and secured a commitment that MCPD would provide training to police officers on this principle and how to comply with it. Although Defendants claim that the Training Bulletin was simply voluntary activity that cannot form the basis of prevailing party status, *see Buckhannon*, 532 U.S. at 605, the issue here is not whether it confers prevailing party status, but whether its adoption can be credited as a component of Garcia's success in this case. Upon consideration of the underlying circumstances, the Court finds that it was not simply voluntary activity. Where it mirrored the Court's ruling on a motion filed by Garcia, was finalized the day before the settlement agreement, was a necessary condition to Garcia's willingness to agree to the remaining

settlement terms, and was referenced in the settlement agreement, the Court concludes that the Training Bulletin was compelled by Garcia's actions in this case which secured a favorable legal ruling, and that it is fairly considered to be one aspect of Garcia's success in this case.

At the same time, Garcia did not secure a declaratory judgment or an admission by MCPD that his First Amendment rights were violated during the June 16, 2011 encounter, nor did he obtain injunctive relief barring MCPD from arresting individuals recording police activity in the future. He also did not secure damages awards, including punitive damages awards, against Officers Malouf and Baxter based on his First Amendment claim, did not prevail on his claim that Officer Baxter had retaliated against him, and did not prevail on his state law claims of battery, malicious prosecution, and false imprisonment, which in any event are not subject to an attorney's fee award under § 1983.

Accordingly, the Court concludes that Garcia achieved only partial success, warranting some reduction below the lodestar figure. Certainly, there should be some recognition of the fact that some portion of the attorneys' billable time, even if inextricably intertwined, was expended on unsuccessful or ineligible claims, as reflected in the billing records and in portions of Defendants' briefs on motions discussing issues such as official capacity claims, qualified immunity, and state law claims. *See Hensley*, 461 U.S. at 436 (noting that in adjusting an attorney's fee award based on partial success, a court "may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success"). Moreover, the lack of damages recovered on the First Amendment claim and the lack of formal declaratory or injunctive relief also warrant a reduction based on limited success.

On balance, the Court concludes that a reduction of 35 percent is warranted. This reduction reflects the Court's assessment of the final remaining *Johnson* factor, the amount in

controversy and the results obtained. *See McAfee,* 738 F.3d at 88 n.5. It reflects both a general estimate of the hours expended on unsuccessful claims and the fact that Garcia did not achieve all of the relief sought. At the same time, it recognizes that in securing a significant monetary payment, a court ruling establishing in this jurisdiction the principle that citizens have a First Amendment right to record police activity, and a commitment that MCPD police officers will be trained on this principle, Garcia achieved a significant success with substantial public benefit. Given these factors, the fact that the attorney's fee award is approximately six times the damages recovery by Garcia does not render it disproportionate or unreasonable. *Compare City of Riverside,* 477 U.S. at 564-66, 572 (affirming a fee award that was approximately seven times the plaintiff's monetary recovery), *with McAfee,* 738 F.3d at 94 (finding a fee award of more than 100 times the damages award to be excessive).

With this adjustment for partial success, the Court will award attorney's fees in the amount of $283,559.25.

**III.    Costs**

Garcia also seeks $12,402.34 in costs. A prevailing party is entitled to reasonable litigation expenses. *Daly,* 790 F.2d at 1084. Those expenses may include "reasonable out-of-pocket expenses incurred by the attorney which are normally charged to a fee-paying client." *Spell,* 824 F.2d at 771. Defendants raise no objection to the costs proposed, so the Court will award Garcia the full $12,402.34.

## CONCLUSION

For the foregoing reasons, Garcia's Motion for Attorney's Fees and Costs is GRANTED IN PART and DENIED IN PART. The Motion is GRANTED to the extent that Garcia is

awarded $283,559.25 in fees and $12,402.34 in costs.  The Motion is otherwise DENIED.  A separate order shall issue.

Date:  March 22, 2018

THEODORE D. CHUANG
United States District Judge